# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JAN 0 2 2014

for CHIEF JUSTICE



This opinion was filed for record
at 8:00 a.m. on Jan. 2, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 84045-8 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| SIONE P. LUI, | ) | |
| | ) | Filed ___JAN 0 2 2014___ . |
| Petitioner. | ) | |
| | ) | |

WIGGINS, J.—This case presents the question of when the confrontation clause requires testimony from lab analysts who conduct forensic tests on evidence. While the United States Supreme Court has grappled with this issue on multiple occasions, a majority of the Court has not adopted a single theory or test. Accordingly, our decision follows the results of recent Supreme Court decisions and proposes a test for *expert witnesses* that does not conflict with Supreme Court precedent.

We examine the plain language of the confrontation right: an accused person has a right to confront "the witnesses against him."[1] Reading these words in light of the founders' intent, the practice of other jurisdictions, and the trajectory of Supreme Court confrontation clause jurisprudence leads us to adopt a rule that an expert

---

[1] U.S. CONST. amend. VI; CONST. art. I, § 22.

comes within the scope of the confrontation clause if two conditions are satisfied: first, the person must be a "witness" by virtue of making a statement of fact to the tribunal and, second, the person must be a witness "against" the defendant by making a statement that tends to inculpate the accused.

Applying this rule shows that there was no violation of Sione Lui's rights under the confrontation clause when the trial court admitted the results of deoxyribonucleic acid (DNA) testing on samples taken from Lui and from the crime scene, or when it introduced temperature readings taken from Elaina Boussiacos's body and the ambient environment. Lui's right to confront a witness was violated by the admission of Boussiacos's postmortem toxicology results and several statements from the autopsy report, but the errors were harmless. Accordingly, the Court of Appeals is affirmed.

FACTS AND PROCEDURAL HISTORY

Lui and Boussiacos had a turbulent relationship, marked by mistrust and infidelity. Although they were engaged and living together by the summer of 2000, Boussiacos was uncertain about their marriage plans, and she alternated between wearing and not wearing her engagement ring. Boussiacos eventually discovered proof of an affair Lui was having with a married woman, and together the two women trapped him in a lie. Lui was aware that his relationship with Boussiacos was in trouble. He feared that Boussiacos would not return from a trip in mid-2000 and called a friend distraught and crying at the prospect of losing her.

Boussiacos told her mother that she no longer planned to marry Lui, and in early 2001, Boussiacos made plans to fly to her mother's home in California. On

2

Friday, February 2, 2001, the night before her flight, Boussiacos dropped off her son from a previous marriage with the boy's father. Lui told police that Boussiacos returned to the couple's home at roughly 10:00 p.m., and the couple watched television. According to Lui's account, Boussiacos packed for the trip, changed into her nightgown, and went to bed.

Boussiacos never arrived in California. Her mother contacted Lui to report her missing the following Monday. On Friday, police found her car in the parking lot of a health club the couple frequented, located near their home. The police discovered Boussiacos's body in the trunk. The owner of the health club testified that she first noticed the car parked in the lot Saturday morning, February 3, and that it did not move all week. Police arranged for a bloodhound track shortly after discovering Boussiacos's body. After smelling a sample of Lui's clothes, the dog followed a scent trail from the lot where the body was found directly to Lui's front porch.

Boussiacos's friends and family agreed that she paid close attention to her personal appearance, taking great care with her dress and makeup when she went out. Her ex-husband testified that she routinely spent two hours on makeup, hair, and clothes before leaving the house. But when found, she had little makeup on, and she was dressed in black sweatpants, torn underwear, and a white T-shirt. Investigators noted that she was wearing tennis shoes, but the laces were tied oddly, on the far sides of each shoe, suggesting that her killer had dressed her after death. In addition, Boussiacos's luggage was packed in an unusual manner, containing several empty containers of hair product and makeup, two hair dryers, and a bottle of nail polish remover without any nail polish.

3

In 2007, detectives reviewing cold cases contacted and interviewed Lui. The State subsequently charged Lui with second degree murder in the death of Boussiacos. At trial, in addition to the evidence described above, the State presented expert testimony from chief medical examiner Dr. Richard Harruff and DNA expert Gina Pineda. Harruff's testimony related to Boussiacos's autopsy. While Harruff personally reviews the reports for each of the 1,300 autopsies that his office processes each year, the actual autopsy had been performed by associate medical examiner Dr. Kathy Raven. Harruff was not present for the autopsy, and while he believed that he saw the body after the procedure, he could not be sure. However, Harruff did not testify to Raven's conclusions; and, the report was not introduced into evidence. Instead, he referred to photographs of the victim's injuries taken during the autopsy to testify that in his opinion, the cause of death was asphyxia by manual strangulation or strangulation with a ligature. Based solely on his experience with strangulation, he offered his opinion that it takes roughly four minutes to die in this manner. Harruff also testified to the position of Boussiacos's body and the odd manner in which she was dressed. While Harruff relied primarily on photographs for this testimony, he made several statements that were taken from the autopsy report.

Harruff testified that the body's temperature at the scene was measured at 38.4 degrees Fahrenheit, and that the ambient temperature was 30.5 degrees Fahrenheit. He did not take these measurements himself. Rather, Raven took the temperature measurements and recorded them in personal notes that were not part of the autopsy report but were later obtained in discovery. Based upon these two temperature data points, Harruff testified to his opinion that although it was

"extremely difficult" to fix an exact time of death, death was possible at any time between the 2nd and 7th of February. 10 Report of Proceedings (RP) at 1354-56, 1398-99.

Harruff also testified to the conclusions of a toxicology report prepared by analyst Martin Hughes of the Washington State Toxicology Laboratory. Harruff did not perform this test personally or supervise it, and he did not offer his professional opinion about the testing methodology. Instead, he recited the report's conclusion that no drugs, alcohol, or nicotine were found in Boussiacos's system.

The Washington State Patrol Crime Laboratory sent DNA samples obtained from the crime scene to two outside DNA laboratories: Orchid Cellmark and Reliagene Technologies, a company that Orchid had acquired.[2] The samples included cuttings from Boussiacos's shoelaces as well as a vaginal swab and a vaginal wash of Boussiacos's body. Pineda, Orchid's associate director and technical leader, testified about her company's testing of these samples against DNA taken from Lui, Lui's son from a previous marriage, and Boussiacos's ex-husband.

Pineda did not personally participate in or observe the tests, noting that since assuming her director role, she had "stepped away from the lab," although she did use the electronic data produced during the testing process to create a DNA profile that reflected "[her] own interpretation and [her] own conclusions . . .'" 12 RP at 1484, 1507. She offered a document summarizing the test results, which the trial court admitted solely for illustrative purposes, ruling that Pineda could refer to it

---

[2] For the sake of simplicity, we analyze Reliagene's tests and Orchid's tests together and refer only to Orchid in the following analysis.

during her presentation but that it would not go back to the jury room. State Ex. 136. Pineda testified that based on the results of these tests, she could not eliminate Lui or Lui's son as a major donor of the male DNA found on the shoelaces. Nor could Boussiacos's ex-husband be eliminated as a donor. The lab's testing was unable to detect a male profile from the vaginal swab extract. However, Lui or Lui's son could not be eliminated as a donor of the DNA found in the vaginal wash.

Lui objected to Harruff's and Pineda's testimony on hearsay and confrontation grounds. The trial court rejected his hearsay argument because ER 703 allows experts to rely on hearsay in forming their opinions. It concluded that there was no confrontation violation because Harruff and Pineda were available for cross-examination. A jury found Lui guilty as charged, and the trial court imposed a standard-range sentence of 200 months of confinement.

Lui appealed and the Court of Appeals affirmed in a published opinion. *State v. Lui,* 153 Wn. App. 304, 325, 221 P.3d 948 (2009). The Court of Appeals concluded that there was no confrontation violation because the expert witnesses testified to their conclusions and Lui had the opportunity to confront them at trial. *Id.* The court also held that while both experts testified about the content of reports they did not prepare, the underlying reports were "offered to explain the basis for their opinions" pursuant to ER 703 and therefore were not subject to the confrontation clause. *Id.* at 322-25.

We accepted review and heard oral argument, but before issuing a decision, we granted the State's motion to file supplemental briefs addressing *Bullcoming v. New Mexico,* __ U.S. __, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011). We then stayed

our decision pending the United States Supreme Court's decision in *Williams v. Illinois*, __ U.S. __, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (plurality opinion). Following the Supreme Court's decision in *Williams*, we lifted the stay and heard reargument in Lui's case.

ANALYSIS

As an initial matter, we must decide whether to analyze Lui's claims solely under the Sixth Amendment to the United States Constitution or separately under article I, section 22 of the Washington Constitution.

I.    Article I, Section 22

Article I, section 22 of the Washington Constitution provides that "[i]n criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . . ." While Lui relies primarily on the Sixth Amendment, he raises article I, section 22 as an alternate ground for relief in the event the court concludes his federal confrontation clause rights were not violated.

We consider six nonexclusive criteria when determining whether a provision of our state constitution should be interpreted independently from its federal analogue: (1) the textual language, (2) differences in the texts, (3) constitutional history, (4) preexisting state law, (5) structural differences, and (6) matters of particular state or local concern. *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

This court has concluded that article I, section 22 merits an independent analysis as to both the manner and the scope of the confrontation right. *State v. Pugh*, 167 Wn.2d 825, 835, 225 P.3d 892 (2009). Therefore, a full *Gunwall* analysis

7

"is no longer necessary." *Id.* Rather, we look to "'"whether the unique characteristics of the state constitutional provision and its prior interpretations actually compel a particular result."'" *Id.* (quoting *State v. Chenoweth*, 160 Wn.2d 454, 463, 158 P.3d 595 (2007) (quoting *City of Seattle v. McCready*, 123 Wn.2d 260, 267, 868 P.2d 134 (1994))). This entails "an examination of the constitutional text, the historical treatment of the interest at stake as reflected in relevant case law and statutes, and the current implications of recognizing or not recognizing an interest." *Chenoweth*, 160 Wn.2d at 463. In this case, none of these factors calls for an independent reading of article I, section 22.

The text of article I, section 22 does not compel a result different from that under the Sixth Amendment. Both the Sixth Amendment and article I, section 22 protect a variety of criminal procedural rights; the relevant right is phrased in the federal constitution as the right "to be confronted with the witnesses against him," while the state constitution uses the language "to meet the witnesses against him face to face . . . ." U.S. CONST. amend. VI; CONST. art. I, § 22. On the face of these provisions, article I, section 22 is unique in that it uses the language "face to face" where the Sixth Amendment does not. However, in *State v. Foster,* 135 Wn.2d 441, 462-63, 957 P.2d 712 (1998), a plurality of this court declined to give literal effect to the "face to face" language. We held that "the meaning of the words used in the parallel clauses is substantially the same." *Id.* at 459.

But even if we read the "face to face" language literally, it would not affect the resolution of this case. There is no question that Lui confronted the State's witnesses "face to face"; the question is whether the State presented the *correct*

witnesses. If the analysts who worked on the crime scene samples were "witnesses against" Lui, then neither the state nor the federal confrontation clause was satisfied. If they were not "witnesses against" Lui, then neither the state nor the federal confrontation clause would require the State to produce them at trial. Nothing about the unique language of article I, section 22 compels a particular result here.

Our prior interpretations of article I, section 22 similarly do not compel a particular result. We have consistently rejected arguments that the state confrontation clause provides greater protection than the federal confrontation clause. *See Pugh,* 167 Wn.2d at 840-45 (excited utterance hearsay exception does not violate state confrontation rights); *State v. Shafer,* 156 Wn.2d 381, 391-92, 128 P.3d 87 (2006) (child hearsay statute does not violate state confrontation rights); *Foster,* 135 Wn.2d at 470 (testimony by closed-circuit television does not violate state confrontation rights). These decisions are consistent with early decisions by Washington courts admitting documentary evidence in lieu of live testimony, as well as prestatehood statutes allowing depositions to be introduced at trial. *See Foster,* 135 Wn.2d at 462. Lui has not shown any particular Washington tradition protecting the right to confrontation over and above the federal standard.

Finally, Lui does not brief the current implications of recognizing or not recognizing an expanded confrontation interest under the Washington Constitution, other than that judges and litigants will benefit from knowing which witnesses will appear at trial. But the interest in knowing which witnesses will appear at trial, as well as the constitutional values underlying article I, section 22, are adequately addressed by the Sixth Amendment test we articulate below. Perhaps in another

9

case there may be occasion to recognize a broader state confrontation right, but these facts do not give us reason to do so.

Neither the constitutional text, the historical treatment of the confrontation right, nor the current implications of adopting a broader confrontation right support an independent reading of article I, section 22 in this case. Accordingly, we analyze Lui's claim solely under the federal confrontation clause.

## II. Confrontation Clause

Supreme Court case law on the confrontation clause is somewhat fragmented and does not provide a controlling rule for cases like Lui's that involve expert witnesses. As we explain below, in the case of nonexpert witnesses, a majority of the Supreme Court has settled on the primary purpose test as the controlling confrontation clause rule. But in the case of expert witnesses, the members of the Court are divided into two groups of four justices each, with Justice Thomas voting independently based on his unique interpretation of the confrontation clause. In the absence of an authoritative Supreme Court majority rule, we must rely on the plain language of the confrontation clause: an accused person has a right to confront "the witnesses against him."[3] As we explain below, the founders' intent and the practice of other jurisdictions can help us to interpret these words and ultimately reach a working rule for confrontation of expert witnesses: a person is a "witness" for confrontation clause purposes only if he or she makes some statement of fact to the court (as opposed to merely processing a piece of evidence) and that statement of

---

[3] U.S. CONST. amend. VI.

fact bears some inculpatory character (meaning that the evidence, without the need for expert interpretation, bears on some factual issue in the case). Under this test, the court did not violate the confrontation clause when it admitted the DNA evidence through Gina Pineda and the temperature evidence through Dr. Richard Harruff. However, the toxicology evidence runs afoul of this test.

### A. Supreme Court Confrontation Clause Jurisprudence—A Core Rule, and Uncertainty on the Periphery

Before 2004, confrontation clause jurisprudence was governed by the indicia of reliability test. *See Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36, 69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In *Crawford*, the Supreme Court jettisoned the indicia of reliability test. What replaced the indicia of reliability test is less clear: in the years since *Crawford*, the Court has issued increasingly fractured sets of opinions in five major confrontation clause cases.

The six cases naturally divide into two sets of three decisions. In *Crawford*, *Davis*, and *Bryant*, the Court dealt with conventional, nonexpert witnesses who had witnessed or had been the victims of the subject crimes. *Crawford*, 541 U.S. 36; *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *Michigan v. Bryant*, 562 U.S. ___, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). The Court was unanimous in *Crawford*, and a solid majority decided *Davis* and *Bryant*. But Justice Thomas articulated the principle that has consistently guided his confrontation clause decisions: "I agree with the Court that the admission of Covington's out-of-court statements did not violate the confrontation clause, but I

11

reach this conclusion because Covington's questioning by police lacked sufficient *formality and solemnity* for his statements to be considered 'testimonial.'" *Bryant*, 131 S. Ct. at 1167 (Thomas, J., concurring) (emphasis added).

In the second triad of cases, the Court considered the admissibility of laboratory analysis reports where the analyst who had performed the testing did not testify. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Bullcoming*, 131 S. Ct. 2705; *Williams*, 132 S. Ct. 2221. In these laboratory analysis cases, Justices Kennedy, Roberts, Breyer, and Alito consistently voted together; Justices Scalia, Ginsburg, Stevens, and Souter (and eventually Justices Sotomayor and Kagan) consistently voted together; and Justice Thomas independently looked for sufficient formality and solemnity. We turn now to both groups of cases.

1. The Core Rule: Conventional Witnesses

In *Crawford,* the defendant's wife told the police that the victim had been unarmed, and the prosecution introduced her statements without calling her to the stand. 541 U.S. at 40. The Court noted that the seminal example of an out-of-court testimonial statement is the trial of Sir Walter Raleigh, in which the prosecution read into evidence Lord Cobham's ex parte statements inculpating Raleigh. *Id.* at 44. It is this sort of "civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused," that the confrontation clause is primarily concerned to exclude. *Id.* at 50. Therefore, *Crawford* was uncontroversially decided. The Court unanimously held that "Sylvia Crawford's statement is testimonial under any definition" and thus must be subject to cross-examination

notwithstanding reliability. *Id.* at 61. The Court further held that Sylvia's statements were not reliable in the first instance because she was "herself a potential suspect" with an incentive to lie, because the police asked leading questions, and because she did not see the entire altercation. *Id.* at 66.

The Court revisited and refined its definition of "testimonial" statements in *Davis*, 547 U.S. 813. In the first of two consolidated cases, Adrian Davis's former girl friend called 911 to report that Davis was presently assaulting her. *Id.* at 817. The 911 recording was admitted into evidence, and Davis was convicted of assault. *Id.* In the second case, officers arrived at Hershel Hammon's house after an altercation between him and his wife; one of the officers stayed with Hammon while the other officer interrogated Hammon's wife in a separate room. *Id.* at 819-20. Hammon's wife authored a "battery affidavit" that the State introduced at trial. *Id.* at 820.

In *Davis*, the Court held that whether a statement was testimonial depended on the declarant's purpose in making the statement. The Court held that the statements of Davis's former girl friend had been made "to enable police assistance to meet an ongoing emergency." *Id.* at 822. The Court held that a statement is testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* That is, a statement is testimonial if it is "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Id.* at 826. Under this analysis, the ex parte statements were properly admitted in Davis's case and improperly admitted in Hammon's case. *Id.* at 834.

Justice Thomas disagreed, dissenting on the ground that testimony must necessarily bear "some degree of solemnity." *Id.* at 836 (Thomas, J., concurring in part and dissenting in part). Therefore, affidavits, depositions, prior testimony, and other statements obtained through a "formalized process" fell within the scope of the confrontation clause, but an informal talk with the police would not. *Id.* at 836-37. For that reason, Thomas argued, the statements in both Davis's and Hammon's cases were admissible. *Id.* at 834.

The *Crawford* consensus began to unravel in *Bryant,* 131 S. Ct. 1143. There, the trial court admitted into evidence the statement of a gunshot victim who identified the shooter to responding police officers. *Id.* at 1150. Six justices of the Court held that, as in *Davis,* the statements did not constitute an "out-of-court substitute for trial testimony," *id.* at 1155, because the declarant's statements were not meant for use at trial, but rather to help resolve the ongoing emergency of "'an unknown shooter who remains at large . . . .'" *Id.* at 1158 (quoting amicus brief). The nature of the emergency diminished the "prospect of fabrication," thus excusing the statements from the confrontation clause. *Id.* at 1157.

Justice Scalia dissented, arguing that the primary purpose of the statements was to provide evidence against the defendant. From the declarant's perspective, the emergency had already ended. *Id.* at 1171 (Scalia, J., dissenting). Therefore, "his statements had little value except to ensure the arrest and eventual prosecution of Richard Bryant." *Id.* at 1170. Justice Ginsburg also dissented, agreeing in full with Justice Scalia's analysis. *Id.* at 1176-77.

Justice Thomas again broke from the primary-purpose test altogether. In concurrence, he argued that the test should be whether the statements were formal and solemn. *Id.* at 1167.

## 2. Scientific Evidence: Three Perspectives

In the next three decisions, the justices divided into three camps as the Court turned from examining statements by conventional witnesses to examining laboratory analysis reports. In *Melendez-Diaz*, 557 U.S. 305, Justices Scalia, Stevens, Souter, and Ginsburg, joined by Justice Thomas, held that three certificates identifying bags of powder as "cocaine" were testimonial, as the certificates were functionally equivalent to affidavits and were created for the primary purpose of providing evidence for trial. *Id.* at 310-11. In fact, "the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance," necessary elements of the crime under Massachusetts law. *Id.* at 311 (quoting MASS. GEN. LAWS ch. 111, § 13). These sworn statements of fact were admitted into evidence and were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id.* at 307, 310-11 (quoting *Davis*, 547 U.S. at 830). Because the witnesses were not subject to cross-examination, the admission of the certificates violated the confrontation clause. *Id.* at 308.

Justice Thomas wrote separately to reaffirm that his support for the majority was conditioned on the formal nature of the affidavits at issue. *Id.* at 329-30

(Thomas, J., concurring).[4] And indeed, the majority's definition of testimony subject to the confrontation clause was qualified by a requirement of formality such as former testimony, statements under oath, or other indicia of formality. *Id.* at 310.

Justice Kennedy, joined by Justices Roberts, Breyer, and Alito, dissented on the ground that laboratory analysts were not "'witnesses against'" a defendant, as they did not bear "personal knowledge of some aspect of the defendant's guilt." *Id.* at 343-44 (Kennedy, J., dissenting). Justice Kennedy offered three distinctions between laboratory analysts and conventional witnesses: "a conventional witness recalls events observed in the past, while an analyst's report contains near-contemporaneous observations of the test"; "an analyst observes neither the crime nor any human action related to it"; and "laboratory tests are conducted according to scientific protocols; they are not dependent upon or controlled by interrogation of any sort." *Id.* at 345-46.

In *Bullcoming,* 131 S. Ct. 2705, the state introduced a certificate recording the defendant's blood alcohol level at 0.21 grams per hundred milliliters through a co-worker of the laboratory analyst who had not observed nor reviewed the actual testing. *Id.* at 2710-12. Again, the Court declared the evidence inadmissible by similar divisions as in *Melendez-Diaz*: Justices Scalia and Ginsburg, now joined by Justices Sotomayor and Kagan who had replaced Justices Stevens and Souter, and

---

[4] The dissent suggests that our analysis is precluded by *Melendez-Diaz* because Justice Thomas signed the majority. Dissent at 4 n.1. That would be true only if formalized evidence, signed by the author, was admitted into evidence. Instead, we have an expert witness relying upon a report that did not come into evidence.

Justice Thomas joining in part.[5] The Court drew parallels to *Melendez-Diaz*, noting that the certificate had an "'evidentiary purpose,'" that it was created "in aid of a police investigation," and that it was formalized. *Id.* at 2717 (quoting *Melendez-Diaz*, 129 S. Ct. at 2532). Therefore, the certificate was testimonial, which left the Court to determine whether the State had satisfied its confrontation clause burden. It had not; the witness had not participated in the test and could not speak to the procedures used or observations made. *Id.* at 2713. The witness had no function except as a "surrogate," merely relaying the conclusions of another. *Id.* at 2715.

Justice Sotomayor wrote separately to emphasize the limited reach of *Bullcoming*, articulating the factual limits of the case: the sole purpose of the certificate was to be introduced into evidence; the witness who testified at trial was not a "supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue"; the testifying witness did not give "his independent opinion about underlying testimonial reports that were not themselves admitted into evidence"; and the document introduced by the State was not limited to "only machine-generated results." *Id.* at 2722 (Sotomayor, J., concurring). Justices Kennedy, Roberts, Breyer, and Alito again dissented, arguing that the report was "impartial" and "prepared by experienced technicians in laboratories that follow professional norms and scientific protocols." *Id.* at 2726 (Kennedy, J., dissenting).

---

[5] Justice Thomas declined to join footnote 6 and Part IV, which defined testimony subject to the confrontation clause without including a requirement of indicia of formality. *Bullcoming*, 131 S. Ct. at 2709.

Thus, in *Melendez-Diaz* and *Bullcoming*, the four-judge block of Justices Scalia, Ginsburg, Sotomayor, and Kagan was joined by Justice Thomas to find a confrontation clause violation. But in the next case, *Williams*, 132 S. Ct. 2221, Justice Thomas joined the four-judge plurality of Chief Justice Roberts and Justices Kennedy, Breyer, and Alito to find no confrontation clause violation. The issue was whether "*Crawford* bar[red] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify." *Id.* at 2227. In *Williams*, an expert testified that a DNA profile taken from a rape victim matched a DNA profile recovered from the defendant. *Id.* at 2230. The expert did not prepare the DNA profile; rather, she relied on a DNA profile prepared by an outside laboratory. *Id.* at 2229. No one from that laboratory was subject to cross-examination. *See id.* at 2227, 2230. Justice Alito wrote for the four-judge plurality, including Chief Justice Roberts and Justices Kennedy, and Breyer, offering "two independent reasons" for finding no violation of the confrontation clause. *Id.* at 2244. First, the expert's reliance on the previous steps in the DNA analysis was not offered to prove the truth of the matter asserted. *Id.* at 2228. As a "second, independent basis" for the decision, Justice Alito pointed out that the DNA profile was produced before the defendant was identified as a suspect and "the profile that Cellmark provided was not inherently inculpatory." *Id.*

The four justices who had voted together in *Bullcoming*—Justices Scalia, Ginsburg, Sotomayor, and Kagan—again voted together in *Williams*. This time Justice Kagan wrote for the four justices. Justice Kagan saw nothing wrong with the expert witness's testimony that two DNA profiles matched each other, for this was "a

18

straightforward application" of her expertise. *Id.* at 2270 (Kagan, J., dissenting). Rather, the Court split on the provenance of the victim's DNA profile, that is, whether the expert affirmed that one of the profiles she was comparing had actually come from the victim, without having participated in creating that profile. *Id.* at 2236. Justice Kagan opined that the expert's testimony required the jury to accept the validity of a DNA test that had not been scrutinized by cross-examination. *Id.* at 2268-69 (Kagan, J., dissenting).

As in *Melendez-Diaz* and *Bullcoming*, Justice Thomas provided the decisive fifth vote, but in *Williams* he concluded that the DNA lab reports lacked sufficient formality or solemnity to be considered testimonial. *Id.* at 2260-61 (Thomas, J., concurring in judgment). And none of these three cases provide a single clear rule because Justice Thomas provided the fifth critical vote in all three cases based on his individual theory that evidence is testimonial only if it bears indicia of formality and solemnity.

The dissent accuses us of counting perspectives and camps rather than signatures. Dissent at 3. However, counting signatures ignores the fact that a majority of the Court has never agreed on a test for expert witnesses, making it very difficult for courts to effectively follow. Four justices joined an opinion holding that the confrontation clause does not apply to expert witnesses when expressing their own conclusions, four justices attached no importance to the fact that evidence came in through an expert witness, and one justice focused on the solemnity of the evidence relied upon by an expert witness. 132 S. Ct. at 2228 (plurality opinion), 2260 (Thomas, J., concurring in judgment), 2269-70 (Kagan, J., dissenting). Even if we

count signatures, our decision is consistent with the five justices in *Williams* who agree that experts may rely upon and disclose independent DNA laboratory results when testifying about their own conclusions without violating a defendant's confrontation rights. *Id.* at 2240 (plurality opinion), 2255 (Thomas, J., concurring in judgment). Our test respects the five justices in *Williams*, while recognizing that in some circumstances an expert witness's testimony may trigger the confrontation clause. Our opinion also does not disregard the results in *Melendez-Diaz* and *Bullcoming* because we address only statements made by expert witnesses and not formalized certificates that are the equivalent of affidavits.

In addition to there being no clear reasoning for expert witnesses, no ruling of the Court is directly on point here. In three important ways, this case brings us into uncharted constitutional territory. First, *Melendez-Diaz* did not reach back to encompass every factual predicate behind an expert witness's findings. The confrontation clause does not demand the live testimony of "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device . . . ." *Melendez-Diaz,* 557 U.S. at 311 n.1. In other words, while a break in the chain of custody might detract from the credibility of an expert analysis of some piece of evidence, this break in the chain does not violate the confrontation clause. *Id.* Second, *Bullcoming* expressly did not reach the confrontation clause status of raw data generated by an automated process without human input. Rather, the subject matter of the confrontation clause concerns those "past events and human actions *not revealed in raw, machine-produced data* . . . ." 131 S. Ct. at 2714 (emphasis added); *see also id.* at 2723

(Sotomayor, J., concurring) ("This is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph. . . . Thus we do not decide whether . . . a State could introduce raw data generated by a machine in conjunction with the testimony of an expert witness."). Finally, *Williams* did not address how the confrontation clause applies to the "panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians." 132 S. Ct. at 2244-45 (Breyer, J., concurring). The same question *Williams* did not reach—the confrontation clause status of forensic reports, expert witnesses, and the technical data underlying their conclusions—is now squarely before us.

### B. "Witnesses Against"—Reaching a Test

In the absence of binding Supreme Court precedent for a rule, we now turn to the plain language of the confrontation right. By its own terms, the confrontation right applies only to "the witnesses against [the defendant]."[6] As we explain below, the word "witness" indicates the act of attesting to facts, while the word "against" indicates that the facts attested to must be adversarial in nature.

The act of imparting factual information to the court is the *sine qua non* of a witness. *Crawford* tells us that a "witness" is a person who "'bear[s] testimony'" and that "testimony" is "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 541 U.S. at 52 (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). This definition does not

---

[6] U.S. CONST. amend. VI.

21

sweep in analysts whose only role is to operate a machine or add a reagent to a mixture.

Justice Kagan pointed out in her dissent in *Williams* that cross-examining a witness could be valuable in order to reveal erroneous lab work. 132 S. Ct. at 2264-65 ("Hence the genius of an 18th-century device as applied to 21st-century evidence: Cross-examination of the analyst is especially likely to reveal whether vials have been switched, samples contaminated, tests incompetently run, or results inaccurately recorded."). The live testimony of a subordinate analyst may be *desirable*, but the question is whether it is constitutionally *required*—and as the Court recognized in *Melendez-Diaz*, the *potential to introduce error* does not a "witness" make. In *Melendez-Diaz*, Justice Kennedy pointed out that many people might be involved in a single drug test and that each of those people had the "power to introduce error," and he asserted that requiring all or "even one of these individuals to testify threatens to disrupt if not end many prosecutions . . . ." 557 U.S. at 333 (Kennedy, J., dissenting). In response, Justice Scalia clarified that the confrontation clause does not demand the live testimony of "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device. . . ." *Id.* at 311 n.1. Although the prosecution is indeed obliged to establish the chain of custody, "*this does not mean that everyone who laid hands on the evidence must be called.*" *Id.* (emphasis added). Rather, gaps in the chain of custody go to the weight of the evidence and not the admissibility. *Id.* (citing *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988)).

22

In other words, merely laying hands on evidence, DNA or otherwise, does not a "witness" make—something more is required. In *Melendez-Diaz*, an analyst became a witness by preparing a statement affirming that a substance was cocaine. *Id.* at 311. In *Bullcoming,* an analyst became a witness by giving live testimony that the defendant's blood alcohol level was 0.21. 131 S. Ct. at 2713. Our analysis here is no different: we are interested in experts who make statements to the court, not people who "la[y] hands on the evidence . . . ." *Melendez-Diaz,* 557 U.S. at 311 n.1.

Not everyone who makes some affirmation of fact to the tribunal will fall under the confrontation clause. The word "against" implies some adversarial element—some capacity to inculpate the defendant.[7] As eight justices (six current) of the Court tell us, the central object of the confrontation clause is "interrogations solely directed at establishing the facts of a past crime, in order to *identify (or provide evidence to convict) the perpetrator.*" *Davis,* 547 U.S. at 826 (emphasis added). The New York Court of Appeals has recognized the necessity for a testimonial statement to bear some inculpatory character; among other factors, New York looks to "'whether the report accuses the defendant by directly linking him or her to the crime.'" *People v. Pealer,* 20 N.Y.3d 447, 454, 985 N.E.2d 903 (2013) (quoting *People v. Brown,* 13 N.Y.3d 332, 339-40, 918 N.E.2d 927 (2009)).

Reading the words "witness" and "against" together, in the context of Supreme Court hints and the reasoned practices of other jurisdictions, gives us a working rule. If the declarant makes a factual statement to the tribunal, then he or

---

[7] The dissent asserts that we have characterized lab results as "inherently accurate." Dissent at 21. However, our focus is not on whether the work of analysts is accurate and reliable, but on whether it is "testimony against" an accused.

23

she is a witness. If the witness's statements help to identify or inculpate the defendant, then the witness is a "witness against" the defendant.[8]

The dissent misunderstands our rule and holding and misstates Supreme Court precedent. This is evident in six ways.

First, the dissent misstates the effect of this opinion, fretting that we have concluded that "laboratory reports are not testimonial" and that "a supervisor can recite the testimony of a subordinate." Dissent at 1. On the contrary, our holding reaches only so far as expert witnesses and identifies when the confrontation clause is satisfied by their cross-examination. Today's opinion does not allow laboratory reports to be admitted into evidence and used against a defendant without effective cross-examination. Nor does it allow a laboratory supervisor to parrot the conclusions of his or her subordinates. Instead, our test allows expert witnesses to rely upon technical data prepared by others when reaching their own conclusions, without requiring each laboratory technician to take the witness stand. The test does nothing more.

---

[8] The dissent fails to grasp this test, which is made clear by its comparison between a police supervisor testifying about eyewitness observations that were recorded by subordinate police officers and an expert witness relying upon work done by other lab analysts when arriving at his or her own conclusions. Dissent at 28. The confrontation clause is triggered when an expert witness makes a factual assertion that is used in court and that factual assertion is inculpatory. This test applies only to expert witnesses. The dissent's comparison fails for two reasons. *Id.* First, the example fails to specify that the police supervisor is not a conventional witness simply describing a crime scene. If the police officer is a conventional witness, the primary purpose test applies. Second, even if the testimony was from an expert witness, the observations would likely be statements of fact that are inculpatory, triggering the confrontation clause. The statements would not need to be interpreted or analyzed by an expert. They would have meaning on their own, unlike DNA data or the temperature of a body without being further analyzed.

Second, the dissent must acknowledge that the United States Supreme Court would reach the same result as this opinion under these facts. The result in *Williams* was that a forensic specialist was permitted to rely upon an outside laboratory's DNA profile when testifying that it matched a sample of the defendant's blood without violating the defendant's confrontation rights. *See Williams*, 132 S. Ct. at 2228 (plurality opinion); 132 S. Ct. at 2255 (Thomas, J., concurring in judgment). Our opinion reaches the same result today: experts may rely upon DNA profiles created by other laboratory analysts when concluding there is a DNA match without violating the confrontation clause.

Third, the dissent misleadingly claims that the United States Supreme Court rejected our test on multiple occasions. Dissent at 5. The holdings the dissent relies on do not conflict with, or preclude, our test. In *Crawford*, the Court held that playing a spouse's tape-recorded statements during her husband's criminal trial violated his confrontation rights when he was not given an opportunity to cross-examine her. 541 U.S. at 40, 68-69. *Crawford* does not preclude our test because it does not address expert witnesses. In *Melendez-Diaz*, the Court held that there was a violation of a defendant's confrontation rights when the court admitted *affidavits* reporting the results of forensic analysis, stating that seized material was cocaine without the witness being subject to cross-examination. 557 U.S. at 307, 329. *Melendez-Diaz* does not preclude our test because the holdings are consistent. If a statement is used against a defendant in court, the declarant must be subject to cross-examination. In *Bullcoming*, the Supreme Court held that it violated the confrontation clause to "introduce a forensic laboratory report containing a testimonial certification,

25

made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification." 131 S. Ct. at 2713. *Bullcoming* does not conflict with the test for expert witnesses. An expert witness may not parrot the conclusions of others and circumvent the confrontation clause, as is seen later in our analysis of the toxicology results. An expert may, however, rely on the work of laboratory technicians when reaching his or her conclusion. Therefore, the holdings of these cases do not preclude the confrontation clause test for expert witnesses.

Fourth, contrary to the claims of the dissent, we agree that if DNA evidence, or other scientific or technical evidence, is used against a defendant in court, the confrontation clause is implicated. The cases cited by the dissent that discuss "neutral" witnesses do so in response to arguments that a witness is exempt from the confrontation clause when the statements are not used *against* the defendant.[9] *See Melendez-Diaz*, 557 U.S. at 313-14. The Court has repeatedly recognized a witness is not excluded from the confrontation clause requirements because his or her testimony appears to be neutral. *See id.* Accordingly, DNA evidence is not

---

[9] The dissent cites to footnote 2 in *Crawford* for the its argument that "seven justices held that the confrontation clause applies to all witnesses against the accused regardless of whether the witnesses are neutral or are experts, such as coroners." Dissent at 5. The footnote in *Crawford* simply states, "[S]everal early American authorities flatly rejected any special status for coroner statements." *Crawford*, 541 U.S. at 47 n.2. The footnote discusses the history of the confrontation clause and whether coroner statements were exempt from the clause. *See id.* Our holding does not create a confrontation clause exception for coroners or for expert witnesses. The dissent also cites to a discussion in *Crawford* that rejected the argument that the wife's statements were exempt from the confrontation clause because they were made to a "neutral" government officer. *Id.* at 66. Again, our opinion does not create an exception to the confrontation clause. We are clarifying when an expert witness may rely upon the work of others when reaching his or her own opinion without violating the confrontation clause.

exempt from the confrontation clause because it is neutral. Our test requires cross-examination, but only cross-examination of the witness who gives meaning to raw data. Not every laboratory analyst is required to testify. *See Williams*, 132 S. Ct. at 2228 (plurality). If DNA evidence is used in trial, someone must be subject to cross-examination. The "someone" required by the confrontation clause is the person who has made the final comparison that is used against the defendant.

Fifth, the dissent insists that we are wishing away *Melendez-Diaz* and *Bullcoming*. Dissent at 7. In fact, we too recognize the holdings of these cases. However, there are distinctions between the facts and legal holdings in those cases and the case before us today. The dissent fails to grasp these distinctions. The Supreme Court has never clearly set forth the confrontation clause requirements for when an expert witness relies on the work of others to arrive at his or her own conclusion.

Sixth, the dissent attaches great importance to *Melendez-Diaz* and the fact that Justice Thomas signed the majority opinion. But the dissent ignores the fact that Justice Thomas also concurred, spelling out his reason for concurring—the documents admitted in *Melendez-Diaz* possessed the requisite indicia of formality. In any event, the holding in the *Melendez-Diaz* opinion was narrower than the dissent would have us believe. After discussing various forms of "core class" testimony, the *Melendez-Diaz* majority concluded that there was "little doubt that the documents at issue [fell] within the 'core class of testimonial statements' thus described." 557 U.S. at 310 (quoting *Crawford*, 541 U.S. at 51). The statements were the equivalent of affidavits, which fit Justice Thomas's view of the confrontation clause applying only

27

to formalized testimony. *See id.* at 329 (Thomas, J., concurring). The *Melendez-Diaz* holding does not extend beyond the equivalent of affidavits or other formalized testimony.

Nothing in prior Supreme Court decisions precludes our test. Applying the test shows that Orchid's DNA analysts were not witnesses against the defendant, but rather facilitated Pineda's role as an expert witness. Similarly, taking the temperature of Boussiacos's body was not an inculpatory act; it helped the expert estimate the time of death. Finally, while the toxicology report and Harruff's statements taken from the autopsy report helped to inculpate Lui, their admission was harmless error.

## C. DNA Evidence

Lui argues that the State violated the confrontation clause when it introduced DNA evidence through a supervisor, Gina Pineda, rather than the analysts who physically conducted the DNA testing. If Pineda had relayed the observations or memory of conventional witnesses, then Lui would be correct. But DNA evidence differs in several important ways from the testimony of conventional witnesses. As we explain below, the DNA testing process does not become inculpatory and invoke the confrontation clause until the final step, where a human analyst must use his or her expertise to interpret the machine readings and create a profile. Pineda used her expertise to create a factual profile that incriminated Lui, and therefore Pineda was the appropriate witness to introduce the DNA evidence.

### 1. Background—The DNA Testing Process

For the first step in DNA analysis, the analyst takes a sample from the evidence recovered from the crime scene. For example, here, an analyst took a

clipping from Boussiacos's shoelaces for further analysis. In no sense does an analyst become a "witness" by extracting a sample for testing; the act is not testimonial because no statement has been made yet. This preliminary step in the analysis is essentially part of the chain of custody: an error at this stage goes to the weight and not the admissibility. *See Melendez-Diaz,* 557 U.S. at 311 n.1 (citing *Lott,* 854 F.2d at 250).

Second, the analyst uses chemicals to break down the sample and release DNA molecules. Here, the chemical compounds, not the human analyst, do all the work. To reiterate, no authority states that the analyst becomes a "witness against" anyone by virtue of adding chemicals to a mixture. Rather, while the analyst's testimony might be helpful in bolstering the authenticity of the sample or the accuracy of the machine, *Melendez-Diaz* does not *require* that testimony. *Id.*

Third, the analyst measures the amount of DNA recovered in the second step and replicates the DNA through a process called polymerase chain reaction, which a witness in this case described as "chemically photocopying the 13 different areas of DNA . . . ." 9 RP at 1155. This is done in order to amplify a small amount of DNA to a level more amenable to testing. The process does not create new information, but only replicates already-existing DNA information. *See State v. Parker,* 350 S.W.3d 883, 894 (Tenn. 2011). During this step, particular areas of DNA are also marked with fluorescent dyes in an automated process. *Williams,* 132 S. Ct. at 2253-54 (Breyer, J., concurring). Once more, the analyst's role is to facilitate the operation of a machine, not to make any factual affirmation and not to serve as a "witness against" anyone.

Fourth, once the DNA has been replicated and amplified, it is processed by a capillary electrophoresis instrument. The machine passes the DNA through a gel matrix that filters particles by size, slowing down larger particles more than smaller ones. With the particles filtered by the gel matrix, a light beam can capture the fluorescent markings on the DNA and identify peaks and repeats in the makeup of the DNA. This step is fully automated; like the gas chromatograph that Justice Sotomayor discussed in the concurrence in *Bullcoming*, it is not testimonial and does not invoke the confrontation clause. 131 S. Ct. at 2723.

Finally, the machine outputs an electropherogram, or a plot of the peaks and valleys in the DNA. *Only* here does *any* element of human decision-making enter the process; an expert must translate the peaks and valleys of the electropherogram into a DNA profile. The expert can then prepare an allele table that compares the DNA profiles taken from various sources. *See* State Ex. 136, at 4. Unlike previous steps in the process, the DNA profile is an affirmation of fact; it is a conclusory statement that a given DNA donor has certain genetic characteristics. But this does not necessarily make the DNA profile into a confrontation clause matter, for two reasons. First, the DNA profile was not introduced into evidence, but only shown during Pineda's testimony for illustrative purposes. It is hard to imagine that a chart that never enters into evidence is meant as "an out-of-court substitute for trial testimony." *Bryant*, 131 S. Ct. at 1155. And the second component of the confrontation clause must still be satisfied—the statement must still be "against" someone.

30

## 2. Application of Confrontation Clause Test

The necessary inculpatory element enters the equation once an expert compares the DNA profiles. Done on the stand in open court, this comparison is permissible as a "straightforward application of [the analyst]'s expertise." *Williams,* 132 S. Ct. at 2270 (Kagan, J., dissenting). The confrontation clause is implicated only at the comparison stage because an allele table does not itself identify (let alone inculpate) anyone, nor would it have any particular meaning to a nonexpert. As the State described the allele table, it appears as "a whole bunch of numbers that kind of look like gobbledygook." 12 RP at 1538. Pineda's expertise was necessary to explain what the numbers represented (the number of times each of 16 specified gene sequences repeated) and why they were significant (the DNA of James Anthony Negron, an alternate suspect, failed to match DNA recovered from the crime scene.) In other words, the allele table lacked the inculpatory character of the certificate reading "Cocaine" in *Melendez-Diaz,* the blood alcohol concentration report in *Bullcoming,* or the witness statements in *Crawford* and *Davis.* The DNA profiles gained their inculpatory character, thus precipitating the confrontation clause issue, only when Pineda's testimony inculpated Lui.

Accordingly, the only "witness against" the defendant in the course of the DNA testing process is the final analyst who examines the machine-generated data, creates a DNA profile, and makes a determination that the defendant's profile matches some other profile. Absent that expert analysis, we are left with an abstract graph or set of numbers that has no bearing on the trial. Pineda was not a surrogate witness whose only purpose was to act as a channel for the DNA profile to enter into

evidence. If she was, then the prosecution would hardly be served, or the defendant identified, by a page of meaningless "gobbledygook." 12 RP at 1538. Rather, Pineda examined the electropherogram and made the determination that Lui could not be excluded as a possible DNA donor.[10] Pineda produced her own analysis, "an original product that can be tested through cross-examination." *United States v. Johnson,* 587 F.3d 625, 635 (4th Cir. 2009).

The dissent argues that the jury saw reports prepared by other case analysts, who were never subject to cross-examination. Dissent at 17. It relies on Pineda's testimony that Hunan Nasir interpreted the results of samples and wrote the reports. 12 RP at 1552. The dissent ignores Pineda's testimony that she prepared the exhibit to use with her testimony. *Id.* at 1497-98; *see* State Ex. 136 (admitted for illustrative purposes only and did not go to the jury room). Pineda also testified that she came to her own results. 12 RP at 1507. She did not simply rely on the conclusions made by Nasir. *Id.* She looked at the electronic data from the samples, drew her own interpretations, and reached her own conclusion. *Id.* Nothing in the record states that the jury saw the reports prepared by Nasir. In fact, the exact opposite is true: Pineda testified that she prepared the exhibit. *Id.* at 1497-98.

In looking to the ultimate expert analysis, and not the lab work that leads into that analysis, we follow the Court in distinguishing between a person who attests to some fact and a person who *aids* an expert witness in reaching an attestation of

---

[10] *See* 12 RP at 1507 ("I came to my own results. . . . [I]n the end, all of the data is reduced to electronic format. Once it comes out of the machine . . . it is what we call an electropherogram, or a plot. . . . I did look at the electronic data from the results. . . . I did draw my own interpretation and my own conclusions from it.").

fact: *Melendez-Diaz* stressed that live testimony is not required if it merely helps to establish "the chain of custody, authenticity of the sample, or accuracy of the testing device." 557 U.S. at 311 n.1. This category of evidence encompasses taking the clippings, adding the chemicals, and running the machines. It was Pineda who took the results from the capillary electrophoresis machine and reached a conclusion of fact from them (thus becoming a witness) and who testified that the conclusion of fact weighed on an issue in Lui's case (thus becoming a witness against Lui).

While Pineda did not personally observe the lab tests that underlaid her analysis—that is, the first four steps of the DNA testing process—*Bullcoming* guarantees the accused the right "to be confronted with the analyst who made the certification," 131 S. Ct. at 2710, and *not* the analysts whose work might have contributed to that certification. Even if *Bullcoming* required the testifying witness to have personal knowledge of the forensic testing, Pineda had such knowledge. Pineda cannot be analogized to the surrogate analyst in *Bullcoming*, or even to the expert in *Williams,* who did not work for Cellmark, had no knowledge of Cellmark's operations, and "for all the record discloses, . . . may never have set foot in Cellmark's laboratory." 132 S. Ct. at 2268 (Kagan, J., dissenting). Rather, Pineda was an experienced supervisor with Orchid and was well informed about the procedures used and observations made. She reviewed the results of the control samples, she reviewed the testing procedures, and she reviewed her subordinate analysts' results at each step in the process. She was "a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Bullcoming,* 131 S. Ct. at 2722 (Sotomayor, J., concurring).

The problem in *Melendez-Diaz* and *Bullcoming* was that the defendant was denied effective cross-examination—in *Melendez-Diaz* because the witness was absent, 557 U.S. at 308, and in *Bullcoming* because the witness lacked the relevant knowledge, 131 S. Ct. at 2707. But here, Lui had the opportunity to cross-examine Pineda on how she arrived at her interpretation and conclusion from the electropherogram. He did not do so, instead focusing his cross-examination on the imprecision inherent to the procedure Orchid used: Y-STR testing focuses on the Y chromosome, which is the same in every person in the same paternal lineage, meaning that a DNA match for Lui is also a DNA match for Lui's son, father, grandfather, and so on. Lui was given a meaningful opportunity to impugn Orchid's DNA evidence, and he in fact did so to the best of his ability.

It is unclear how Lui's confrontation clause rights would be further vindicated by requiring the State to call "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device . . . ," and the Supreme Court has never imposed such a requirement. *Melendez-Diaz,* 557 U.S. at 311 n.1. Indeed, such an onerous requirement would, "for all practical purposes, forbid[] the use of scientific tests in criminal trials." *Id.* at 332-33 (Kennedy, J., dissenting). Empirical data show that defendants frequently demand to confront scientific witnesses: since *Melendez-Diaz* was decided, some state laboratories have estimated that their backlog of drug tests has risen by 40 percent and their backlog of alcohol and toxicology tests has risen by 15 percent, resulting in delays or dismissals when lab technicians are unable to attend trials. Hon. G. Ross Anderson Jr., *Returning to Confrontation Clause Sanity: The Supreme*

*Court (Finally) Retreats From* Melendez-Diaz *and* Bullcoming, 60 FED. LAW. 67, 71 (2013). In addition, an analyst may be unable to attend trial due to sickness, travel, inclement weather, or being called to testify in another trial. *Melendez-Diaz,* 557 U.S. at 343 (Kennedy, J., dissenting). An analyst may also die prior to trial, an issue not yet resolved by Supreme Court precedent. *Williams,* 132 S. Ct. at 2251 (Breyer, J., concurring).

The rule we adopt today avoids the risk of unduly burdening the use of scientific evidence, while preserving the benefits of using a multiplicity of analysts. In the context of DNA testing, as many as 12 different analysts may be involved in a single case. *Id.* at 2252 (Breyer, J., concurring). Spreading out the testing procedure among different analysts not only promotes "efficiency in the laboratory," 12 RP at 1572, it also is an important safeguard against fabrication. A laboratory that uses multiple analysts can segregate the analysts working on the suspect's sample from the analysts working on the crime-scene sample. *Williams,* 132 S. Ct. at 2252 (Breyer, J., concurring). Screening off the analysts from each other frustrates the potential fabricator, who will have access to only one of the two DNA profiles needed for a match to exist. Furthermore, the use of multiple analysts is also a useful safeguard against error because multiple analysts can review each other's work in a way that a single analyst cannot.

In short, we decline to adopt a rule that encourages laboratories to entrust cases to lone analysts, thereby giving the hypothetical rogue analyst *more* opportunities to fabricate results. More generally, we decline to adopt a rule that makes DNA evidence unduly burdensome to introduce because the use of less

reliable eyewitness evidence may increase the risk of erroneous convictions. *Id.* at 2251 (Breyer, J., concurring). Neither result is helpful to defendants or to the State, and neither result furthers the confrontation clause's goals of checking potential error or fabrication. Under our test, Pineda was the only person involved in Orchid's testing process who made a statement of fact that tended to inculpate Lui. Thus Pineda was exactly the right analyst to satisfy the strictures of the confrontation clause. The State properly introduced the DNA evidence through her.

### D. Temperature Readings

Lui also asserts that the State was required to introduce the temperature readings of Boussiacos's body and the ambient temperature through the live testimony of Dr. Kathy Raven, who took those readings. But like the Orchid DNA analysts, Raven did not become a "witness against" Lui by merely taking temperature readings. She may have been a "witness" by virtue of recording the temperatures, thus creating factual information for later use by the court. But she did not do so "against" Lui. Like the raw DNA profile, Raven's temperature data had no relevance to Lui's case *until* Dr. Harruff used that data to estimate a range for the time of death. In fact, until Dr. Harruff determined that the time of death was consistent with the prosecution's theory, the temperature readings could well have benefited Lui. In other words, the first prong of our test was met—Raven created a factual statement of the temperature of Boussiacos's body and of the ambient environment. But the second prong was not met because these points of data could not inculpate Lui without the intervening analysis of an expert. Because Harruff used

his expertise to turn raw data into a conclusion that inculpated Lui, it is Harruff and not Raven with whom the confrontation clause is concerned.

### E. Toxicology and Autopsy Reports

Lui objects to the admission of evidence that Boussiacos had no drugs in her system at the time of death. He asserts that Dr. Richard Harruff had no personal knowledge about the toxicology screen on Boussiacos's body and did not offer his professional opinion about the results; rather, he argues that Harruff was merely a mouthpiece for the conclusions of an absent analyst. Similarly, Harruff testified to statements taken directly from the autopsy report about which he had no personal knowledge. These include that Boussiacos had bruising under her scalp and within her neck muscles, that her hair was in a ponytail, that she was wearing a long sleeve shirt that was pulled up toward her chest, that her bra was wadded up and placed underneath her shirt, and that the examining pathologist described certain scratches as "contusions."

Lui is correct. Like the temperature readings, the information taken from the toxicology report and autopsy report were statements of fact. But unlike the temperature readings, these statements had an inculpatory effect: the toxicology report was prepared to identify the cause and manner of Boussiacos's death and relied upon at trial to rebut Lui's testimony that Boussiacos might have been smoking prior to her death. The statements from the autopsy report were also for the purpose of identifying the manner of death and were used to prove that Boussiacos was dressed postmortem. All of the statements were used by the prosecution to convict Lui. Furthermore, unlike Harruff's testimony based on the autopsy

photographs or temperature readings, Harruff did not bring his expertise to bear on the statements or add original analysis—he merely recited a conclusion prepared by nontestifying experts.[11] His testimony falls precisely within the scope of testimony proscribed by *Bullcoming,* and it was error to admit the toxicology report and statements from the autopsy report.

However, these erroneous admissions do not warrant a new trial. A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict cannot be attributed to the error. *State v. Watt,* 160 Wn.2d 626, 635, 160 P.3d 640 (2007). Under our "overwhelming untainted evidence" test, we look to the untainted evidence to determine if it was so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy,* 104 Wn.2d 412, 426, 704 P.2d 1182 (1985).

We applied the "overwhelming untainted evidence" test in *State v. Anderson,* 171 Wn.2d 764, 254 P.3d 815 (2011). There, the defendant was charged with first degree child molestation for allegedly abusing a child referred to as M.A.E. *Id.* at 766. The State introduced the testimony of another alleged victim of Anderson's, C.C.S., through a nurse practitioner who had examined him. The State also introduced Anderson's confession to molesting a third child, K.R.P.; the live testimony of the detective who had investigated K.R.P.'s case; and the testimony of

---

[11] The dissent suggests that it is inconsistent that we could find a toxicology report to be inculpatory but not the DNA testing. Dissent at 11. However, DNA testing becomes significant only when data is turned into a profile and that profile is compared to known samples. It is at this point that the data becomes meaningful to a case and inculpatory. In comparison, the toxicology report was an inculpatory statement without being interpreted by Harruff.

M.A.E. himself. *Id.* Anderson appealed, arguing that the trial court had erred by permitting the nurse to testify to C.C.S.'s statements. We held that even if the introduction of C.C.S.'s statements violated the confrontation clause, any error was harmless. *Id.* at 770. We noted that aside from C.C.S.'s statements, there was also unchallenged testimony by M.A.E. and evidence of Anderson's prior abuse of K.R.P. In comparison, we described the nurse's testimony as "cursory" and pointed out that it occupied less than one page of the trial transcript. *Id.* For those reasons, we held that "[g]iven the amount of evidence presented and the fact that nurse Young's testimony added little, if any, evidence to prove the elements of the current charge against Anderson, we find that the trial court's error in admitting nurse Young's testimonial statements was harmless." *Id.*

This case is much the same. Like the testimony in *Anderson,* the toxicology report does nothing to prove any element of the charges against Lui. Boussiacos's toxicology was implicated only to rebut Lui's statement to police that Boussiacos might have been murdered while sneaking out to smoke. Lui's false statement to investigators, however, was only one of many reasons for the jury to doubt Lui's credibility. As the prosecution showed, Lui repeatedly changed his accounts of when Boussiacos planned to depart for California, when she packed for her trip, and when he became aware of Boussiacos's intention to leave. Lui's testimony about his affair, his phone call with his sister at 1:00 a.m., Boussiacos's favorite pajamas, and Boussiacos's engagement ring was flatly inconsistent with the testimony of other witnesses. Finally, DNA evidence contradicted Lui's denial that he had had sexual

intercourse with Boussiacos prior to her death. Aside from the toxicology report, the State produced significant evidence detracting from Lui's credibility.

The statements taken from the autopsy report about Boussiacos's injuries were minor compared to the properly admitted evidence. Harruff, trained in forensic pathology, examined photographs taken both at the crime scene and during the autopsy. Harruff describes the injuries in the photographs in over 20 pages of direct-examination. Harruff testified that the photographs showed a number of prominent abrasions on Boussiacos's neck and petechiae[12] on her face, indicating strangulation and a struggle. There were also a number of other injuries, including bruising on her face, shoulders, left hand, and arm pit region. Harruff testified that the color of the abrasions indicated that the injuries occurred close to the time of death.

The other statements taken from the autopsy report were minor. Harruff was asked by the State if page 3 of the autopsy report indicated how Boussiacos's hair was styled. He responded that her hair was pulled back in a ponytail. However, the jury later saw a picture of the left side of Boussiacos's hair. The jury also saw photographs of Boussiacos's pants, underwear, shoes, and socks, indicating that she was abnormally dressed. Additionally, her shirt and shoes were present in court. Harruff's improper testimony was minor compared to the evidence properly admitted. And, properly admitted evidence corroborated most of his statements.

Significant other untainted evidence supported a finding of guilt. The State produced evidence showing Lui was angry that Boussiacos was going to "leave him

---

[12] Small red dots on the skin resulting from ruptured blood vessels.

and reclaim her own life," 14 RP at 1805; evidence suggesting that Boussiacos had died before she could dress or put on her customary makeup; evidence suggesting that Boussiacos had been dressed and her bags packed by "somebody who doesn't know anything about women," 14 RP at 1838; testimony that a police bloodhound led investigators directly to Lui; evidence of Lui's familiarity with the area where Boussiacos was found; and evidence of Lui's unusual conduct during the investigation. The weight of this evidence makes it implausible that the jury's verdict could be attributed to the toxicology and autopsy reports—evidence that was discussed in 2 pages of a nearly 2,000 page record. 10 RP at 1397-98. The cumulative, untainted evidence necessarily led to a finding of guilt, and thus the Court of Appeals correctly rejected Lui's confrontation clause challenge to the admission of the toxicology and autopsy reports.

## CONCLUSION

The State satisfied the confrontation clause when it produced the "witness[es] against" the defendant—that is, analysts who use their expertise to reach a factual conclusion bearing on an issue in Lui's case. Lui's claim to the contrary overlooks the plain language of the confrontation clause and its overarching purpose of preventing civil-law examinations of the type used in Sir Walter Raleigh's trial. *Crawford*, 541 U.S. at 44. The absent DNA analysts here cannot be compared to the absent Lord Cobham in that trial: their role was limited to handling and manipulating evidence and machines, analogous to the chain of custody. While we are sensitive to the risk of erroneous or fraudulent lab conduct, the potential for error is no greater than the risk of mishandling of evidence somewhere along the chain of custody.

Because the chain of custody is not a confrontation clause issue, neither is laboratory work, without more.

Here, Pineda was Lord Cobham to Lui's Raleigh: by taking the output of a laboratory process and using her expertise to construct an incriminating DNA profile from the data, she became Lui's accuser. The confrontation clause required Pineda's testimony, which the State produced. Therefore, there was no error. Neither was there error in the court's admission of temperature or reversible error in the admission of the toxicology or autopsy evidence. We affirm the Court of Appeals.

No. 84045-8

WE CONCUR.

_Madsen, C.J._

_Wiggins, J._

_Gonzàlez, J._

43

No. 84045-8

STEPHENS, J. (dissenting)—While the majority's test "avoids the risk of unduly burdening the use of scientific evidence," majority at 35, it does so only by ignoring and misreading controlling precedent, at the cost of Washington defendants' Sixth Amendment right to confront the witnesses against them. The majority's misguided detour into long-settled questions leads it to conclude that laboratory reports are not testimonial after *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and that a supervisor can recite the testimony of a subordinate after *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011).

These conclusions violate Sione Lui's federal constitutional right to confront the witnesses against him. Whether the majority believes the confrontation clause *should* apply to testimony about "scientific" evidence—and the increasingly serious incidents of misconduct at crime laboratories counsel that it should—is immaterial;

it is the law under *Melendez-Diaz* and *Bullcoming*, and remains the law after *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (plurality opinion). We cannot wave away the clear holding of these cases because we would have decided them differently; nor can we adopt a test that categorically violates the confrontation rights of defendants.

Each of the four reports the prosecution offered against Lui is testimonial under controlling United States Supreme Court precedent. Because the State funneled this testimony into evidence through expert witnesses who lacked any personal knowledge of the facts they recited, Lui was denied his right of confrontation under the Sixth Amendment. This error was not harmless, and he is entitled to a new trial. I respectfully dissent.

## ANALYSIS

The majority claims that our discretion in this case is boundless because case law from the United States Supreme Court "does not provide a controlling rule for cases . . . that involve expert witnesses." Majority at 10. This is an overstatement at best. In *Williams*, the Court failed to resolve whether an expert witness may testify to "his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Bullcoming*, 131 S. Ct. at 2722 (Sotomayor, J., concurring).

But this is the *only* question the Court has not answered, and the *only* issue on which we granted review. *See* Pet. for Review at 1 ("Is the Sixth Amendment Confrontation Clause violated when an expert witness's testimony is based on the

work of others who do not testify, and that work was done for the purpose of the criminal prosecution?"). Unfortunately, the majority wanders far afield from this issue without addressing it, instead offering new law in well-traveled areas. Because the testimonial reports introduced against Lui are identical to the reports at issue in *Melendez-Diaz* and *Bullcoming*, those precedents control our analysis.

*A. Laboratory Reports and Test Results Prepared for Trial Are Testimonial*

The confrontation clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The majority claims this "plain language" as the source of its test. Majority at 10. The plain language of the confrontation clause, however, does not distinguish between expert and nonexpert witnesses. Moreover, the United States Supreme Court has already determined that "[t]he Constitution's text does not alone resolve" the scope of the confrontation right. *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Instead, we must turn to controlling United States Supreme Court precedent. While the majority counts "[p]erspectives" and "camps" in these cases, *see* majority at 15, it should count signatures. In *Melendez-Diaz* and *Bullcoming*, five justices signed majority opinions of the Court, yielding precisely the authority the majority complains we lack. *Compare Melendez-Diaz*, 557 U.S. at 306 ("Justice [Antonin] Scalia delivered *the opinion* of the Court") (emphasis added) (capitalization

omitted)[1] *and Bullcoming*, 131 S. Ct. at 2709 ("Justice [Ruth Bader] Ginsburg delivered *the opinion* of the Court, except as to Part IV and footnote 6" (emphasis added) (capitalization omitted)), *with Williams*, 132 S. Ct. at 2227 ("Justice [Samuel] Alito [Jr.] announced the *judgment* of the Court and delivered *an opinion*, in which the Chief Justice, Justice Kennedy, and Justice Breyer join" (emphasis added) (capitalization omitted)).

Rather than apply the law of these cases to the issues before us, the majority crafts an entirely new test, the centerpiece of which is a distinction between neutral and inculpatory witnesses and between conventional and nonconventional witnesses (i.e., nonexpert and expert witnesses). *See* majority at 24 n.8. The majority finds support for its distinction in Justice Anthony Kennedy's dissent in *Melendez-Diaz*. *See id.* at 16. The majority embraces Justice Kennedy's view that laboratory analysts

---

[1] While Justice Clarence Thomas also wrote separately in *Melendez-Diaz*, this does not erase the precedential value of the majority opinion he signed. *See United States v. King*, 194 F.R.D. 569, 576 n.7 (E.D. Va. 2000) (explaining that "'[a] decision with only a simple concurrence should not be considered a plurality decision'" (quoting Ken Kimura, Note, *A Legitimacy Model for the Interpretation of Plurality Decisions*, 77 CORNELL L. REV. 1593, 1595 n.13 (1992))). Justice Thomas knows how to concur in a judgment without signing the opinion; he did it in *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), which was decided two years before *Melendez-Diaz. Id.* at 834 (Thomas, J., concurring) (writing separately because "I concur only in the judgment in *Davis v. Washington*"). Instead, his simple concurrence explained that the report also bore sufficient "'indicia of formality'" to come within the confrontation clause. *Melendez-Diaz*, 557 U.S. at 329-30 (Thomas, J., concurring) (quoting *Giles v. California*, 554 U.S. 353, 378, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008)). Moreover, the Court's definition in *Melendez-Diaz* was not "qualified by a requirement of formality," as the majority believes, majority at 16, but rather explained that there are three categories of testimonial statements: "'*ex parte* in-court testimony or its functional equivalent,'" "'extrajudicial statements . . . contained in formalized testimonial materials,'" and "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Melendez-Diaz*, 557 U.S. at 310 (quoting *Crawford*, 541 U.S. at 51-52).

are not "'witnesses against'" a defendant because they make neutral factual findings, and unlike "conventional" inculpatory witnesses they should not be required to testify to their observations. *Id.*; *see Melendez-Diaz*, 557 U.S. at 333-34 (Kennedy, J., dissenting); *Bullcoming*, 131 S. Ct. at 2726 (Kennedy, J., dissenting). A casual reader of the majority's account would be forgiven for assuming that Justice Kennedy's distinction between neutral and inculpatory witnesses is the law. It is not. The United States Supreme Court has rejected the majority's newfound test four times.

In *Crawford*, seven justices held that the confrontation clause applies to all witnesses against the accused regardless of whether the witnesses are neutral or are experts, such as coroners. 541 U.S. at 47 n.2, 66. In *Melendez-Diaz*, five justices again rejected the notion that the confrontation clause distinguishes between neutral or inculpatory witnesses or that laboratory analysts should be exempted because they are unconventional witnesses. 557 U.S. at 313-14; *id.* at 329-30 (Thomas, J., concurring). The Court held that the confrontation clause, when read in conjunction with the adjacent compulsory process clause, "contemplates two classes of witnesses—those against the defendant and those in his favor." *Id.* at 313. The Court dismissed the majority's third class of "neutral" witnesses, holding instead that *all* witnesses who testify against the defendant must be available for cross-examination, not just those who offer "inculpatory" testimony. *Id.*; *see also id.* at 316 (noting this distinction "would exempt all expert witnesses—a hardly 'unconventional' class of witnesses"). The Court further explained that "[i]t is often,

indeed perhaps usually, the case that an adverse witness's testimony, taken alone, will not suffice to convict." *Id.* at 314. The Court emphasized that it has been "longstanding case law" that a police report identifying certain property as stolen triggers the confrontation clause against a defendant on trial for receiving stolen property even though the report is not actually inculpatory. *Id.* Moreover, the Court refused to exclude neutral scientific testing from confrontation clause protection because it "is little more than an invitation to return to our overruled decision in [*Ohio v.*] *Roberts*," 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). *Melendez-Diaz*, 557 U.S. at 317.

Five justices again rejected the majority's distinction between neutral and inculpatory testimony in *Bullcoming*, holding that even results transcribed from a gas chromatograph machine without the analyst's interpretation or independent judgment are subject to confrontation. 131 S. Ct. at 2714-15. Justice Kennedy complained (correctly) that *Bullcoming* would subject all "impartial lab results" to confrontation, even those "prepared by experienced technicians in laboratories that follow professional norms and scientific protocols." *Id.* at 2726 (Kennedy, J., dissenting). Most recently, in *Williams*, five justices once again rejected the argument that only testimony accusing a specific, known defendant is subject to cross-examination. 132 S. Ct. at 2273-74 (Kagan, J., dissenting); *id.* at 2263 (Thomas, J., concurring in the judgment).

The majority's insistence that its confrontation clause test is grounded in the plain language of the Sixth Amendment is particularly ironic because adopting it

requires us to ignore the plain language of the United States Supreme Court. While the Court has been divided on many issues involving the confrontation clause, in four cases at least five justices have rejected the majority's view. After several unsuccessful challenges in which this argument was the centerpiece of the State's briefing and pressed forcefully at oral argument, there can be no doubt that laboratory analysts are constitutionally indistinguishable from any other witness, and that reports about results observed in a laboratory are no different from reports by any eyewitness about any other subject matter. Most recently, in *State v. Jasper*, 174 Wn.2d 96, 115-16, 271 P.3d 876 (2012), this court unanimously relied on *Melendez-Diaz* and *Bullcoming* as controlling authority for this proposition and rejected the State's attempt to paint these cases as less authoritative than *Crawford*. Even the *Williams* plurality acknowledges that *Crawford, Melendez-Diaz*, and *Bullcoming* "are to be deemed binding precedents." 132 S. Ct. at 2242 n.13 (plurality opinion). The majority may not like these holdings, but it cannot wish them away.

Instead, we must apply controlling law to the questions before us. The rule is simple: a statement is testimonial, and gives rise to a confrontation right, if its primary purpose is "to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). This "primary purpose" test applies equally to a written statement that purports to relay the results of scientific testing. *See Melendez-Diaz*, 557 U.S. at 310-12 (holding that a certificate reporting the results of drug testing

triggers the confrontation clause because it was "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" and the analyst who produced it was well aware of its "evidentiary purpose" (quoting *Crawford*, 541 U.S. at 52)). The primary purpose test applies whether the witness wears a police jacket or a lab coat, and whether the testimony concerns a crime scene or a test tube.

*B. The Laboratory Reports and Test Results at Issue Are Testimonial*

In its most recent confrontation clause decision, a fractured United States Supreme Court affirmed the Supreme Court of Illinois without a holding. *Williams*, 132 S. Ct. 2221. Justice Samuel Alito Jr. wrote the lead opinion, joined by three of his colleagues. *Id.* at 2227. This plurality rested on two grounds, the first being that the DNA (deoxyribonucleic acid) profile was not offered for the truth and the second being a narrower version of the "primary purpose" test that covers only inculpatory statements—those made "for the purpose of obtaining evidence to be used against petitioner." *Id.* at 2228. This narrower test is virtually identical to the one the majority discovers in the "plain language" of the Sixth Amendment. However, five justices flatly rejected this drastic narrowing of the confrontation clause, and it is no more the law than are Justice Kennedy's previous dissents. *Id.* at 2273-74 (Kagan, J., dissenting); *id.* at 2262-63 (Thomas, J., concurring in judgment) (noting the plurality's test lacks "any grounding in constitutional text, in history, or in logic").

Because five justices failed to sign any one opinion or concur in any one rationale, *Williams* merely affirmed the lower court's judgment without a holding.

It stands as a single-case deviation from the majority opinions of the Court in *Melendez-Diaz* and *Bullcoming*, and it is no broader than its facts. Under those facts, all we know from *Williams* is that an expert may testify to a DNA profile performed by a nontestifying analyst without triggering the confrontation clause if that profile is an informal report created in order to meet an ongoing emergency and to exclude possible suspects before the defendant was ever targeted as a suspect, and that profile is never admitted, shown, read, or identified to the fact finder as a source of the expert's opinions in a bench trial. *Id.* at 2230, 2236, 2242 (plurality opinion).

Nonetheless, *Melendez-Diaz* and *Bullcoming* remain the law, and they plainly hold that "any document prepared for use in a criminal proceeding" is testimonial. *Jasper*, 174 Wn.2d at 112. Because each of the reports at issue in this case meets this test, and also meets the *Williams* plurality's narrower definition of "primary purpose," each is testimonial and falls within the confrontation clause.

At issue are four potentially testimonial forensic reports. First, Dr. Kathy Raven recorded the temperature of Elaina Boussiacos's body and the outside air at the time and place where her body was found. 10 Report of Proceedings (RP) at 1353-55. Second, Raven prepared an autopsy report that concluded Boussiacos was killed by strangulation. *Id.* at 1334-40, 1405; Ex. 168, at 1. As part of her report, Raven also took photographs of Boussiacos's injuries and the manner in which she was dressed. 10 RP at 1358-65, 1375-95. Third, Martin Hughes with the Washington State Toxicology Laboratory (WSTL) prepared a toxicology report on blood samples taken from Boussiacos at the request of the King County medical

examiner. Ex. 168, at 10. Finally, DNA analysts Hunan Nasir of Reliagene Technologies and Ms. Vendetes of Orchid Cellmark prepared separate reports that compared DNA samples taken from Lui, Lui's son, and Boussiacos's ex-husband with DNA samples collected from the victim. 12 RP at 1491, 1552, 1567; Ex. 136, at 4.

Each of these reports is testimonial under the logic of the four *Williams* dissenters because it was "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Crawford*, 541 U.S. at 52 (quoting amici brief). Each of these reports is also testimonial under the *Williams* plurality's narrower "primary purpose" test, and is therefore testimonial under the reasoning of eight justices.

Unlike the DNA testing in *Williams* that took place before any suspect had been identified, the reports at issue here were created after investigators identified Lui as a suspect in Boussiacos's murder on February 8, 2001. 8 RP at 996. Raven performed the autopsy on February 10, WSTL performed the toxicology screen on February 12, and Orchid Cellmark, and Reliagene Technologies conducted the DNA testing even later—all after Lui was a suspect and solely for the purpose of collecting evidence for his prosecution. Ex. 168, at 2, 10. Consequently, here, unlike in *Williams*, there was a "'prospect of fabrication'" because the analysts had an incentive to produce something "other than a scientifically sound and reliable profile." *Williams*, 132 S. Ct. at 2244 (plurality opinion) (quoting *Michigan v. Bryant*, ___ U.S. ___, 131 S. Ct. 1143, 1157, 179 L. Ed. d 93 (2001)).

Also unlike the DNA testing in *Williams*, which the plurality described as inherently exculpatory because it was designed to exclude huge portions of the population in a search for an unknown rapist, the DNA testing performed by Orchid and Reliagene was inherently inculpatory because it was prepared "for the primary purpose of accusing a targeted individual." *Id.* at 2229, 2243 (plurality opinion). These lab-tested samples were taken from Lui to determine whether it matched DNA samples recovered from the crime scene and for the sole purpose of proving that he had recent sexual relations with the victim and had tied her shoelaces after death. 12 RP at 1491.

The majority claims the DNA reports are neutral and insists that they "do[] not . . . identify (let alone inculpate) anyone," majority at 31, because they are merely "affirmation[s] of fact" that "a given DNA donor has certain generic characteristics." *Id.* at 30. It is difficult to see how the reports do anything *but* identify Lui as the source of cells and semen found on the victim's body. Ex. 136, at 4. Indeed, the majority lauds DNA tests for their reliability in obtaining convictions of identified individuals. Majority at 36. Moreover, if the majority is correct that a negative blood test for nicotine is inculpatory, *id.* at 37, how is a DNA report that positively identifies Lui as the contributor and excludes the only other suspect *not* at least equally as inculpatory? The majority reasons that the reports are distinguishable because a toxicology test, unlike a DNA profile, is inculpatory without having to compare the results to anything. *See id.* at 38 n.11. The majority, however, fails to explain how the toxicology report indicating the victim had no

nicotine in her bloodstream is at all inculpatory unless compared to Lui's statement that she may have been attacked when she went out to smoke a cigarette.

Additionally, although the majority characterizes the DNA report as "meaningless 'gobbledygook,'" that required Gina Pineda's expertise to decode, *id.* at 32 (quoting 12 RP at 1538), the graphic Pineda referred to was prepared as a visual aid for trial, and it is both readable and meaningful to a lay person. The graphic Pineda referred to on the stand takes the familiar form of a chart. *See* Ex. 136, at 4. Each column displays a source of DNA, and each line shows a potential for a genetic match. *Id.* The more matches between a suspect and a sample, the greater the likelihood that the sample contains the suspect's DNA. While expertise is necessary to calculate precisely *how* probative any given result is in terms of probability, anyone can see that there are far more matches between the samples and Lui's DNA than any other potential suspect. Thus, the report is plainly inculpatory, and hardly "gobbledygook." But even if the report were written in hieroglyphics, the Sixth Amendment guarantees a defendant the right to confront *all* witnesses against him, not just those who offer easy-to-understand testimony, or who openly profess the defendant's guilt.

Even the State concedes that the reports offered against Lui implicate the confrontation clause under the *Williams* plurality's primary purpose test. State's Suppl. Br. Addressing *Williams v. Illinois* and Article I, Section 22 of the Washington Constitution at 5 n.5 (admitting that the plurality's narrow definition "might not apply" to the reports in this case because Lui had already been identified

as a suspect). The State is correct. Whether the DNA report meets the majority's pliable definition of "inculpatory," it and each of the other reports at issue satisfies the definition of "testimonial" applied by eight of the justices who decided *Williams* and by a majority of the Court in *Melendez-Diaz* and *Bullcoming*.

Raven's recorded temperature measurements are also testimonial under *Melendez-Diaz* and *Bullcoming*, and under the *Williams* plurality's narrower "primary purpose" test. Raven recorded these readings from Boussiacos's body and the outside air where her body was found on February 8, shortly *before* the State identified Lui as a suspect. *See* 10 RP at 1353-56. However, unlike the DNA testing in *Williams*, these temperature readings were not recorded to meet an ongoing emergency or exclude potential suspects—they were designed to determine the time of the victim's death. 14 RP at 1809.

Although the majority claims recording this temperature reading was not an inculpatory act, majority at 36, the only conceivable purpose for recording it, and for determining the time of Boussiacos's death, was to support a criminal prosecution. An objective witness in Raven's circumstances would anticipate the use of her measurements in a later trial. *See State v. Mason*, 160 Wn.2d 910, 921-23, 162 P.3d 396 (2007) (noting that "the test is objective"), *abrogated in part on other grounds by Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008); *see also Williams*, 132 S. Ct. at 2243 (plurality opinion) (noting that "the primary purpose that a reasonable person would have ascribed to the statement" controls the inquiry). Because the temperature measurements were recorded not by

a third-party private laboratory but by a state investigator at a murder scene for the primary purpose "to establish or prove past events potentially relevant to later criminal prosecution," *Davis*, 547 U.S. at 822, these results would satisfy even the narrower test for testimonial statements advanced by the *Williams* plurality.

Raven's autopsy report and the WSTL toxicology report were no less inculpatory or testimonial. Even the majority concedes that they met its test. Majority at 37-38. They were prepared to prove the cause and manner of Boussiacos's death, and relied upon at trial to prove that the killing was intentional and that she had no nicotine in her system—not to exclude a class of suspects. 10 RP at 1375-99; 14 RP at 1830-31, 1850-51. None of these tests were designed to meet an "ongoing emergency" or to catch an unidentified criminal who "was still at large." *Williams*, 132 S. Ct. at 2243 (plurality opinion).

Like the testimonial DNA reports created by Nasir and Vendetes that were introduced to the jury through Pineda's testimony, Raven's autopsy report was testimonial and introduced into evidence through Dr. Richard Harruff's testimony. Raven's autopsy report qualifies as "testimonial" under any test. It is testimonial under the United States Supreme Court's "primary purpose" test, the narrower *Williams* plurality test, and even the majority's new "witness against" test. Majority at 37-38. Like any other autopsy report, it is not "machine-generated," it contains numerous attestations of fact, and Raven's account of the victim's body when found and the cause and manner of death can be described only as inculpatory.

While medical examiners may perform autopsies for reasons both related and unrelated to trial, the confrontation clause does not require that trial testimony be the *sole* purpose for an out-of-court statement—only that it be the *primary* purpose. *Bryant*, 131 S. Ct. at 1155; *Davis*, 547 U.S. at 822. This test is objective, not subjective; it asks whether a reasonable person standing in the examiner's shoes would understand the report's "evidentiary purpose" and "'believe that the statement would be available for use at a later trial.'" *Melendez-Diaz*, 557 U.S. at 311 (quoting *Crawford*, 541 U.S. at 52). Raven's autopsy report meets this test.

On the front page of the report, Raven signed her name to her opinion that "[t]he cause of death . . . is due to asphyxia due to neck compression. The manner of death is classified as homicide." Ex. 168, at 1. Regardless of whether Raven complied with a statute when she wrote those words, no reasonable person would have any doubt that the report would be offered against a defendant at a murder trial. Indeed, the very *reason* medical examiners have a statutory duty to prepare written autopsy reports is to further and support the criminal prosecution of persons accused of assault, rape, murder, and other serious crimes. No one subject to the statutory command to provide such a report "upon the request of the prosecuting attorney" could misunderstand its purpose or significance.[2] RCW 68.50.106.

---

[2] This same logic applies to our analysis of the toxicology report, which the majority correctly concludes is testimonial, albeit for the wrong reasons. In Washington, the state forensic lab is required by statute to provide "all necessary toxicology procedures requested by all coroners [and] medical examiners." RCW 68.50.107; RCW 43.43.670(1)(c). The toxicology report in this case was requested by the King County medical examiner and was no less mandated by statute than the autopsy report. Ex. 168, at 10.

If there was ever any doubt that autopsy reports satisfy the primary purpose test for testimonial evidence, *Melendez-Diaz* erased it. *See* 557 U.S. at 318 n.5 (naming autopsies among the class of forensic analyses subject to the confrontation clause); *id.* at 322 ("whatever the status of coroner's reports at common law in England, they were not accorded any special status in American practice" (citing *Crawford*, 541 U.S. at 47 n.2)); *id.* at 335 (Kennedy, J., dissenting) (acknowledging that autopsy reports would satisfy the majority's test).

*C. The Results of Genetic Testing Are Testimonial*

The majority contends that the test results reported by analysts at Orchid and Reliagene are not subject to the confrontation clause because genetic tests yield "'raw, machine-produced data'" that is not testimonial. Majority at 20 (emphasis omitted) (quoting *Bullcoming*, 131 S. Ct. at 2714 (Sotomayor, J., concurring)). The majority is wrong, both about the law and about these tests. Although Pineda testified that she *examined* raw machine data to prepare her report, 12 RP at 1507, the State did not offer this data into evidence and the jury never saw it. The jury *did* see excerpts from the reports prepared by analysts Nasir and Vendetes that purported to summarize the results of this testing.[3] Ex. 136, at 4; *see* 12 RP at 1552, 1540. It

---

[3] The majority concludes that "[n]othing in the record states that the jury saw the reports prepared by other lab analysts," majority at 32, based on Pineda's testimony that "I did look at the electronic data from the results in the samples in this case. I did draw my own interpretation and my own conclusions from it." 12 RP at 1507. The record, however, is not so clear as the majority believes. Pineda's aforementioned testimony was in response to questions regarding how she arrived at her expert conclusions. *Id.* She did not specify whether the chart that the jury saw was based on raw data from the electropherogram or from the reports of Nasir and Vendetes. However, when explaining the data in the chart, Pineda explained that the data was based on whether it was reported. Pineda specifically stated, "If you look at the other column, starting with the right most column, the vaginal

is this testimonial report that implicates the confrontation clause, and Lui had a right to confront Nasir and Vendetes about the results they recorded, no matter how these were generated.

As for the DNA reports, they were plainly the work of human hands and a human mind, as was the rest of the presentation of which they were a part. Ex. 136, at 1-4. It does not matter that they summarized the results of repeated DNA testing, much of which was performed by machine; virtually *all* forensic lab work is performed by or in conjunction with machines, just as police work involves radar detectors, breath test devices, and license plate readers. Justice Sonia Sotomayor's caution about the scope of the Court's holdings in *Bullcoming* carves out only *raw*, machine-produced data, not all testimony that purports to relate the results of machine testing, about which the witness may just as easily lie or be mistaken as when relaying any other fact. *See* 131 S. Ct. at 2722 (Sotomayor, J., concurring).

The majority concedes that the WSTL toxicology report was inculpatory and therefore implicated Lui's confrontation rights, majority at 38, though chemical analysis of blood is hardly less machine aided than DNA testing. Reports attesting to machine-generated results were squarely at issue in both *Melendez-Diaz* and *Bullcoming*.

---

wash, you can see that at some row you have a number and other have an NR, which stands for no results or not reportable for any reason. That means that we didn't detect peaks at all at that locus, or the peaks did not meet the minimum threshold for us to use it in our interpretation and to put it in a report." *Id.* at 1540. Based on Pineda's testimony, it seems the jury did see data from the DNA reports prepared by Nasir and Vendetes, though it was funneled through Pineda's testimony and chart.

In *Melendez-Diaz*, a majority of the Court rejected the distinction between testimony about tests that are "'neutral'" and "'scientific,'" and less-reliable "testimony recounting historical events, which is 'prone to distortion or manipulation.'" 557 U.S. at 317. Instead, the Court insisted that analysts must testify about recorded laboratory results even if they possess "the scientific acumen of Mme. Curie and the veracity of Mother Teresa." *Id.* at 319 n.6. And in *Bullcoming*, the Court categorically rejected the argument that an analyst was not subject to confrontation because he was a "'mere scrivener'" who reported factual output from a machine, exactly as DNA analysts Nasir and Vendetes did here when they transcribed the results of testing into a human-readable report. 12 RP at 1552, 1567; *see* 131 S. Ct. at 2714-15 (rejecting the distinction between neutral and inculpatory facts, and noting it would reach far beyond laboratory testing to all testimony about "factual conditions or events," such as "'the light was green'"). Moreover, Nasir and Vendetes were not mere scriveners; "[Nasir] was the one to interpret the results and write the reports," 12 RP at 1552, and Vendetes decided whether to exclude certain peaks in the DNA from the Cellmark report, *id.* at 1569, 1572.

It is true that photographs, blood samples containing DNA, and indeed all forms of physical evidence are not testimonial, but this is because they do not testify to anything. It is because physical evidence does not assert any fact beyond its own existence. *State v. Appleby*, 289 Kan. 1017, 221 P.3d 525, 551 (2009) ("DNA itself is physical evidence and is nontestimonial"); *Herrera v. State*, 367 S.W.3d 762, 773

(Tex. App. 2012) ("[a]n autopsy photograph . . . is not a testimonial statement"). But physical evidence is made a part of testimony, and a confrontation right arises, when a human witness attests to some fact about the physical evidence that is not apparent from the fact of the evidence itself.

The majority's concern that respecting defendants' Sixth Amendment confrontation rights in this context will swamp the system with unnecessary witnesses is hyperbolic. No one disputes that the State can offer evidence without producing a witness to testify to each step in the chain of custody. *See Melendez-Diaz*, 557 U.S. at 311 n.1 ("we do not hold . . . that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case"). The majority's argument that not every analyst who operates a machine or performs a step in the analysis becomes a "witness" is a straw man. The confrontation clause obviously does not require every person who touches physical evidence to be cross-examined. No one claims that it does, and the majority needlessly belabors this point.

By definition, the confrontation guaranty applies only to witnesses who *testify* against the defendant. *Crawford*, 541 U.S. at 52. Witnessing a laboratory test is a necessary condition of being a "witness" under *Bullcoming*, but it is not a sufficient condition that gives rise to a confrontation right under *Crawford* and *Melendez-Diaz*. An analyst who touches a sample does not testify against a defendant any more than a police officer does when he handles physical evidence at a crime scene. A

confrontation right arises only when that witness *testifies* against a criminal defendant, and when the State offers that testimony against the defendant.

The confrontation clause obviously does not give Lui the right to cross-examine the analysts who took shoelace cuttings and processed the samples, but not because they work in a laboratory or because their analysis was based on the output of machines. Lui has no right to cross-examine these analysts for the simple reason that *their testimony was not offered against him.* Unlike the other analysts who worked on these samples, Nasir and Vendetes each prepared a report testifying to their observations of the results. 12 RP at 1552, 1567; Ex. 136, at 4. Moreover, Nasir and Vendetes did more than simply record the data—they created it. *See Melendez-Diaz*, 557 U.S. at 322-23. They interpreted the data, deciding what to report and what to exclude. 12 RP at 1552, 1569, 1572. These reports are testimonial, and because the State offered it against Lui at trial, he had the right to cross-examine the analysts who prepared them.

Not only does the confrontation clause draw no distinction between testimony about laboratory results and testimony about other events, but the majority's characterization of this testimony as inherently accurate is itself flawed. Scientific evidence from test results is not as objective and factual as the majority believes. Before a DNA test result is reported on a graph or chart, a human analyst picked up each sample, made notations on a report (or did not), used care to ensure the sample's integrity (or did not), followed the laboratory's protocol to ensure accuracy (or did

not), reported all DNA peaks (or did not), and recorded his or her observations accurately (or invented them out of whole cloth).

To the extent that forensic testing depends upon a human analyst, it contains the same potential for human error and calls just as strongly for cross-examination as testimony by a "conventional" witness about "conventional" topics. S*ee Williams*, 132 S. Ct. at 2264-65 (Kagan, J., dissenting) (arguing that "[c]ross-examination of the analyst is especially likely to reveal whether vials have been switched, samples contaminated, tests incompetently run, or results inaccurately recorded").

The serious and growing problem of "drylabbing," in which forensic analysts report results of tests that were never performed, also belies the majority's confidence that the results of supposedly objective, factual machine data cannot easily be manipulated or manufactured. In Massachusetts, a state crime lab analyst with fraudulent scientific credentials attested to fictional drug test results in roughly 34,000 cases without drawing any concern from her supervisors. *See J. Hearing of the H. Comms. On Pub. Health, Pub. Safety & Post-Audit Oversight*, 187th Gen. Court (Mass. 2012) (statement of Dr. JudyAnn Bigby, Sec'y, Exec. Office of Health & Human Servs., Nov. 28, 2012, available at http://www.mass.gov/eohhs/docs/ bigby-testimony-crime-lab-112812.doc; Brittany Brady, *Chemist in Massachusetts Drug Sample Case Lied about Degree*, CNN (Sept. 26, 2012, 9:59 AM), http://www.cnn.com/2012/09/25/justice/massachusetts-chemist. Despite the majority's attempt to pin these incidents on isolated and "hypothetical rogue

analyst[s]," at least one other analyst at a Massachusetts crime lab was also tampering with evidence. Majority at 35; Zach Howard, *Second Chemist Charged in Massachusetts Drug Lab Scandal*, REUTERS (Apr. 1 2013, 5:23 PM), http://www.reuters.com/article/2013/04/01/us-usa-massachusetts-crimelab-idUSB RE9300KJ20130401.

Laboratory misconduct is not limited to Massachusetts. Forensic examiner Jonathan Salvador's "lack of attention to detail" and "lack of understanding of chemistry" were rewarded with numerous promotions at the Public Safety crime lab in Houston, where his falsification of results has put close to 5,000 drug cases into question. James Pinkerton & Brian Rogers, *Crime Lab Analyst Kept on Job Despite Shoddy Work*, HOUST. CHRON. (Apr. 6, 2013), http://www.houstonchronicle.com/ news/houston-texas/houston/article/Crime-lab-analyst-kept-on-job-despite-shoddy-work-4413046.php. Other examples abound. *See Melendez-Diaz*, 557 U.S. at 318-19 (describing incidents); Thomas J. Lueck, *After Falsified Test Results, Kelly Orders Forensic Shakeup*, N.Y. TIMES (Apr. 20, 2007), *available at* http://www.nytimes.com/2007/04/20/nyregion/20chief.html?_r=1&0 (reporting that a police crime lab analyst falsely reported results of drug tests).

The majority's breezy dismissal of the potential for laboratory fraud is particularly inappropriate given Washington's recent history of such problems. In 2008, the head of the state crime and toxicology labs resigned after King County judges found "ethical lapses and a climate of compromise" at the facility, including a senior manager who fabricated toxicology results. *State Toxicology Lab Chief*

*Resigns over DUI Errors*, KOMO NEWS (Feb. 14, 2008, 2:38 PM), *available at* http://www.komonews.com/news/local/15643687.html (last updated Sept. 27, 2010). And most recently, the manager of the state crime lab in Cheney resigned after it was discovered that he had fabricated arson investigation reports in "at least five cases." Gene Johnson, *State Patrol Says Crime Lab Manager Falsified Work*, KOMO NEWS (Apr. 16, 2013, 7:46 AM), *available at* http://www.komonews.com/news/local/State-crime-lab-manager-resigns-amid-investigation-203214851.html.

The majority's argument that exempting laboratory reports from the confrontation clause will actually *reduce* drylabbing is nonsensical. Majority at 35-36. Nothing in *Melendez-Diaz* or any other case prevents forensic technicians from operating in teams or jointly analyzing samples, and nothing in the many recent incidents of drylabbing supports the majority's hollow claim that teams of workers are a natural check on the problem. Criminal defendants are entitled to more than the majority's empty assurances of reliability; they are entitled to cross-examine the witnesses who testify against them, including those witnesses whose testimony is submitted in written form. *Crawford*, 541 U.S. at 61.

The majority wrings its hands over the possibility that laboratory analysts might miss trials "due to sickness, travel, inclement weather, or being called to testify in another trial," majority at 35, but, of course, so might police officers or any other eyewitnesses or expert witnesses. The majority's concern for scheduling proves too much, and would subordinate all confrontation rights of Washington citizens to the convenience of a trial calendar. Nor does the majority explain why

-23-

the mortality of laboratory analysts sets them apart from other witnesses. *Id.* *Crawford* plainly anticipates that witnesses may be unavailable, holding that the testimonial statement of a witness who does not appear and is "unavailable to testify" is inadmissible unless the defendant had "a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54.

This does not leave the State helpless, or make a medical examiner's lifespan a "'statute of limitations for murder.'" *Melendez-Diaz*, 557 U.S. at 335 (Kennedy, J., dissenting) (quoting Carolyn Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement*, 96 CAL. L. REV. 1093, 1094, 1155 (2008). Photographs and other physical evidence—including fingerprints, tool marks, and samples of blood and semen—are not testimonial, and any analyst can examine them if the original analyst dies or is otherwise unavailable. Indeed as described below, although Raven was not available to testify, Harruff testified to the cause of Boussiacos's death based almost entirely on nontestimonial photographs in her autopsy report. Photographing routine field measurements also ensures this evidence survives the investigator— just as photographing an officer's observations at the crime scene ensures this testimony will survive him.

Nor does the Sixth Amendment require the State to keep physical evidence it would otherwise throw away. Washington State crime labs already store, control, or reference samples for trial and for later retesting as a matter of course because of the realities of appeal and postconviction challenge, and the utility of this evidence

for solving other crimes, including "cold cases." *See generally* RCW 43.43.753 (establishing a state bank for DNA samples); FORENSIC LABORATORY SERVS. BUREAU, WASH. STATE PATROL FORENSIC SERVICES GUIDE (Jan. 2012), *available at* http://www.wsp.wa.gov/forensics/docs/bureau/forensic_services_guide.pdf (describing long-term storage methods for DNA and other physical evidence). Forensic testing is neither as unique or uniquely reliable as the majority claims nor as vulnerable as it fears.

### D. A Supervisor Is Not a "Witness" to a Test He or She Did Not Personally Conduct or Observe

The majority and the State assert that even if the various reports offered against Lui were testimonial, there was no error because he had an opportunity to cross-examine Harruff and Pineda, both of whom were competent to testify about the testing protocols in place at their respective workplaces. Majority at 33 (characterizing Pineda as "an experienced supervisor" who "was well informed about the procedures used"); *see* State's Suppl. Br. at 21; State's Suppl. Br. Addressing *Williams v. Illinois* and Article I, Section 22 of the Washington Constitution at 9 (characterizing these experts as "hands-on supervisors who were intimately familiar with the relevant laboratory's procedures"). This line of reasoning is foreclosed after *Bullcoming*, as there is simply no room to argue that a supervisor who did not personally observe a test is a "witness" to the results of this test.

The majority insists that the problem in *Bullcoming* was that the defendant "was denied *effective* cross-examination." Majority at 34 (emphasis added). Because Lui was able to "effectively" cross-examine Pineda and Harruff, the majority asserts his confrontation right was satisfied. Not so. The problem in *Bullcoming* was not with the *effectiveness* of the cross-examination; the problem was that the analyst who testified about the results of a blood test was not a "witness" under the plain language of the confrontation clause. 131 S. Ct. at 2710 (holding that "[t]he accused's right is to be confronted with the analyst who made the certification"). The majority's endorsement of the "effectiveness" of Lui's cross-examination also runs directly counter to *Crawford*'s rejection of extrinsic measures of reliability as the benchmark for the confrontation right. *See* 541 U.S. at 67, 69.

While the confrontation clause is concerned with the reliability of testimony, it provides "a procedural rather than a substantive guarantee." *Id.* at 61. The only way to satisfy a defendant's confrontation right is to allow him to cross-examine the witness who offers testimony—not that witness' supervisor. In *Bullcoming*, the Court gave no weight to the fact that the testifying analyst was a "knowledgeable representative of the laboratory" who could "explain the lab's processes and the details of the report." 131 S. Ct. at 2723 (Kennedy, J., dissenting). Instead, the Court reiterated that "'it will not permit the testimonial statement of one witness to enter into evidence through the in-court testimony of a second.'" *Id.* at 2715 (quoting *Melendez-Diaz*, 557 U.S. at 334 (Kennedy, J., dissenting)).

Just as in *Bullcoming*, the experts who testified against Lui were supervisors who could testify about general testing procedures, but lacked even a limited "personal . . . connection to the scientific test at issue." *Id.* at 2722 (Sotomayor, J., concurring). Their earnestness and the fact that they were "well informed about the procedures used," majority at 33, are constitutionally irrelevant. It is clear from the record that Harruff did not perform the autopsy and was not even in the building when it was performed, 10 RP 1339, and Pineda testified that she did not observe or participate in the testing at Reliagene and that she was not necessarily in Texas during the testing at Cellmark, 12 RP at 1489, 1494-95, 1567. The analysts who actually performed the autopsy, recorded the victim's body temperature, measured blood for nicotine, and reported the results of DNA testing never took the stand, and Lui never had the opportunity to cross-examine them about their educational backgrounds, employment history, methods, or conclusions—the majority's assurance about "effectiveness" notwithstanding.

A police supervisor would never be allowed to testify to eyewitness observations about a crime scene that were recorded by his subordinate, under the guise of providing expert testimony, no matter how closely he reviewed the notes, but that is precisely what the majority would allow here. *See Davis*, 547 U.S. at 826 (holding that the confrontation clause may not be "evaded by having a note-taking policeman recite the . . . testimony of the declarant" (emphasis omitted)). The only difference in Lui's case is the presence of a science degree and a lab coat, and after *Melendez-Diaz* and *Bullcoming*, these trappings have no constitutional significance.

Lui was denied his right to confront the witnesses who had firsthand knowledge of the testimonial evidence the State offered against him.

### E. Expert Testimony about Reports Prepared by a Nontestifying Witness Violates the Confrontation Clause

The State also argues that Lui's confrontation right was not violated because Harruff and Pineda did not offer any reports into evidence but only relied on them as the basis for their expert opinions. We stayed our decision in hopes that *Williams* would resolve the question of expert testimony about reports prepared by nontestifying witnesses. Unfortunately, it did not; indeed, *Williams* left the area muddier than before. Nor does the majority resolve this question. We should confront it and recognize that expert testimony violates a defendant's confrontation right when the expert acts as a "conduit" by reading the substance of a testimonial report into evidence.

In Lui's case, both the trial court and the Court of Appeals held that his confrontation rights were not violated by expert testimony because the underlying reports were offered as a basis for expert opinion and not for their truth. *State v. Lui*, 153 Wn. App. 304, 322-25, 221 P.3d 948 (2009); 10 RP at 1368. The *Williams* plurality advanced this theory as an alternative to its narrowed primary purpose test, opining that "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Williams*, 132 S. Ct. at 2228. As noted, five justices have repeatedly rejected this theory.

Justice Thomas protested that there is "no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." *Id.* at 2257 (Thomas, J., concurring in the judgment). The four dissenters agreed that the DNA report was offered for its truth, reasoning that "to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies." *Id.* at 2268-69 (Kagan, J., dissenting). The Washington Court of Appeals agreed, concluding that whether a statement falls under a hearsay exception "does not save it from confrontation clause analysis" if it is *also* offered for its truth. *State v. Fraser*, 170 Wn. App. 13, 23, 282 P.3d 152 (2012).

In Lui's case, the State did not offer the lab results to impeach his credibility or rebut his testimony. Instead, just as in *Williams*, the only conceivable purpose for expert testimony about DNA testing, temperature readings, autopsy findings, and toxicology results was to introduce these results for their truth. *See* DAVID H. KAYE, DAVID E. BERNSTEIN, & JENNIFER L. MNOOKIN, THE NEW WIGMORE: A TREATISE ON EVIDENCE: EXPERT EVIDENCE § 4.10.1, at 196 (2d ed. 2011) (noting that "[t]o use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true").

The fiction that these results could "assist the jury in deciding what weight to give" the expert's opinion is baffling. *Lui*, 153 Wn. App. at 323 n.19. Before the jury could give testimony about these test results any weight it had to first determine whether the underlying reports were true. And, it is unclear what else it could

-29-

conclude from reports stating that genetic material found at the crime scene matched genetic material taken from the suspect, that no drugs were found in the victim's system, and the temperature of the victim's body when she was found. Ex. 136, at 4; Ex. 168, at 10.

Most courts to consider this question since *Melendez-Diaz* and *Bullcoming* have rejected the categorical approach advanced by the *Williams* plurality and by the State. Instead of concluding as a matter of law that expert testimony cannot violate a defendant's confrontation right because it does not come in for its truth, these courts ask whether the expert testified from personal knowledge and opinion or was merely a "conduit" for the underlying testimonial report. *See, e.g., State v. Gonzales*, 2012-NMCA-034, ¶ 8, 274 P.3d 151, 153 (cautioning that without safeguards, Fed. R. Evid. 703 would allow prosecutors to "use surrogate witnesses disguised as experts in order to introduce evidence that otherwise would trigger the Sixth Amendment's Confrontation Clause"); *United States v. Pablo*, 696 F.3d 1280, 1287-89 (10th Cir. 2012) (warning that expert testimony can be "little more than a backdoor conduit for an otherwise inadmissible statement"); *State v. Kennedy*, 229 W. Va. 756, 773, 735 S.E.2d 905 (2012) (holding "to the extent that [a witness] is a 'mere conduit' for the opinions of the authoring pathologist, such testimony violates the Confrontation Clause"). This "conduit" test respects that evidence rules like Fed. R. Evid. 703 are not legal conclusions and have no claim to precedence over the Sixth Amendment.

The conduit test's distinction between permissible and impermissible expert opinion testimony closely follows the rejection of other forms of surrogate testimony in *Davis*, *Melendez-Diaz*, and *Bullcoming*. It also addresses the concern that a bright-line rule permitting experts to read testimonial reports into evidence would put the confrontation clause once again at the mercy of the evidence code. *See, e.g.,* *Williams*, 132 S. Ct. at 2256 (Thomas, J., concurring in the judgment) ("I do not think that rules of evidence should so easily trump a defendant's confrontation right"); KAYE, BERNSTEIN & MNOOKIN, *supra* § 4.10.1, at 196-97 (urging courts not to "permit an end-run around a constitutional prohibition" by accepting "[t]he factually implausible, formal claim that experts' testimony is being introduced only to help in the evaluation of the expert's conclusions, but not for its truth"). As this court has previously held, ER 703 """was not designed to enable a witness to summarize and reiterate all manner of inadmissible evidence."""" *State v. DeVries*, 149 Wn.2d 842, 848 n.2, 72 P.3d 748 (2003) (quoting *State v. Martinez*, 78 Wn. App. 870, 880, 899 P.2d 1302 (1995) (quoting 3 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE § 389, at 663 (1979))).

We should hold that ER 703 is not a per se exemption from the confrontation clause for expert testimony and formally adopt the conduit test. Expert testimony based on inadmissible testimony satisfies the defendant's confrontation right if the expert testifies to his own opinion and conclusions, but not if he merely funnels the testimony of a nontestifying witness into evidence.

Applying the conduit test to the circumstances at hand, we should conclude that Harruff's testimony about temperature measurements taken at the scene by Raven violated Lui's confrontation rights. Harruff did not take these measurements or observe the test, and his recitation of Raven's figures did not reflect his personal knowledge or opinion. 10 RP at 1354, 1369. While the majority correctly holds that Harruff's testimony about the results of the WSTL toxicology screen violated Lui's confrontation right, majority at 38, we should explain *why* this is so. Harruff had no personal knowledge about the actual testing performed by the laboratory, or even who performed the tests, and did not offer his professional opinion about the results. 10 RP at 1397-98. Harruff's role in introducing these results was that of "a well-credentialed conduit for testimonial hearsay." *United States v. Ramos-González*, 664 F.3d 1, 5 (1st Cir. 2011).

While Pineda's testimony about the results of DNA testing also included her expert opinion about what the results reported by Nasir and Vendetes *meant*, she testified to the results of six tests which she did not perform or observe, and about which she had no personal knowledge. 12 RP at 1484, 1489, 1494-95. Each of these tests attested to the presence or absence of genetic information in a particular sample. Ex. 136, at 4. Although the report was not admitted, it was shown to the jury, and Pineda effectively read the results into evidence by her testimony, describing results that were inextricably linked to her conclusions. 12 RP at 1517 ("we obtained a 10 locus profile"); *id.* ("We noted that [Lui] cannot be excluded as one of the major

DNA donors"); *id.* at 1519 ("because the peaks that [Lui] possesses, were also detected in the shoelaces . . . he cannot be excluded as a major donor").

The confrontation clause requires testimony by at least one analyst who personally performed or observed the test at issue, and the expert witness evidence rule offers no exception. The confrontation clause cannot be evaded by substituting "a note-taking policeman" for the declarant. *Davis*, 547 U.S. at 826. Transforming the policeman into a DNA expert and the governing rule from ER 701 to ER 703 does not alter the constitutional equation. Although Pineda added her expertise to the analysis, she also read the results to the jury and denied Lui his right to confront the witnesses, analysts Nasir and Vendetes, who actually observed these tests and testified to the results in their reports.

Harruff's testimony about Raven's autopsy report and autopsy photographs presents a different matter. As discussed above, photographs and other physical evidence are not testimonial and an expert may refer to them without violating a defendant's confrontation right. *See State v. Roberts*, 142 Wn.2d 471, 522, 14 P.3d 717 (2000) (permitting testimony from a blood splatter expert who reviewed only documentary evidence of photographs and videotape and examined the victim's clothing and chair).

Harruff's testimony about the nature of Boussiacos's injuries and the cause of her death was based almost entirely upon photographs that the State entered into evidence. 10 RP at 1375-97. Although Harruff testified to bruising of the neck muscles and bruising under the scalp that were not apparent in the photographs, this

testimony constituted a tiny fraction of his overall testimony. *Id.* at 1392. Moreover, his testimony that it takes four minutes to die from strangulation came entirely from his expertise and personal knowledge; it did not parrot Raven's report or even refer to it. *Id.* at 1385, 1397.

We should hold that Harruff's testimony about Boussiacos's injuries, the cause of her death, and the condition of her body based upon autopsy photographs was an appropriate exercise of his expert opinion and did not violate the confrontation clause. *See Commonwealth v. Avila*, 454 Mass. 744, 912 N.E.2d 1014, 1029 n.19 (2009) (holding that a medical examiner's opinion about the cause of a wound is permissible if based on a photograph properly admitted into evidence, but not if it recites findings in the autopsy report).

*F. The Confrontation Clause Is Not an Unbearable Burden*

Ultimately, the majority argues that we must deny defendants the right to confront laboratory analysts because the burden it places on the State is too heavy, apparently indignant that defendants granted this right by *Melendez-Diaz* have actually exercised it.[4] Majority at 34-35. While the confrontation clause places a burden upon the courts and prosecutors of Washington State, this is hardly a persuasive argument for dispensing with one of the bedrock guaranties of our criminal justice system. The Sixth Amendment also guarantees to criminal

---

[4] The majority's claim that the United States Supreme Court has not decided "the confrontation clause status of forensic reports," cannot be squared with its complaint that *Melendez-Diaz* is to blame for an increase in demand for laboratory analyst testimony. *Compare* majority at 21, *with* majority at 34-35.

defendants the right to a speedy and public trial, to have facts (even "neutral" and "scientific" facts) found by a jury, and to be appointed a competent lawyer at no cost. U.S. CONST. amend. VI. Each of these guaranties has cost our State incalculable money, time, and lost convictions, and the costs continue to mount. If the majority is willing to exempt laboratory analysts from cross-examination to save a little, why not strike confrontation entirely, or do away with jury trials and court-appointed attorneys, and save much more?

Notwithstanding the United States Supreme Court's admonition that the confrontation clause, like the right to trial by jury and the privilege against self-incrimination, "is binding, and we may not disregard it at our convenience," *Melendez-Diaz*, 557 U.S. at 325, this burden is not as heavy as the majority claims. Indeed, we already live with all of the consequences the majority imagines, and have for the four years since *Melendez-Diaz* settled the questions with which the majority belatedly grapples. The sky has not fallen in this time, here or in any other state. There is at least one practical reason for this: the United States Supreme Court has now twice endorsed the constitutionality of notice-and-demand statutes exactly like Washington's, which condition the defendant's confrontation right on the timely filing of an objection to the State's offer of evidence. *See id.* at 326-27; *Bullcoming*, 131 S. Ct. at 2718; CrR 6.13(b). While CrR 6.13(b) does not excuse the State from its obligations under the confrontation clause, it places the burden of requesting analyst witnesses squarely where it belongs: on the criminal defendant. *See Melendez-Diaz*, 557 U.S. at 327 ("The defendant *always* has the burden of raising

-35-

his Confrontation Clause objection; notice-and-demand statutes simply govern the *time* within which he must do so."); *State v. Schroeder*, 164 Wn. App. 164, 167-68, 262 P.3d 1237 (2011) (finding that the defendant waived his right to confrontation on a piece of evidence by failing to file a timely objection).

Finally, although the State has a strong interest in the efficient provision of criminal justice, I cannot agree that confrontation runs entirely counter to this interest. The sheer number of reversals and new trials that attend each new drylabbing scandal illustrate the cost of insulating laboratory analysts from cross-examination. Requiring analysts to testify to their own qualifications and represent their own work gives the State a strong incentive to weed out incompetent technicians, and laboratories a strong incentive to develop programs and procedures that thrive in "the crucible of cross-examination." *Crawford*, 541 U.S. at 61. While it may be bitter, confrontation is good medicine for the criminal justice system, and the integrity of the convictions it obtains. Washington prosecutors and courts are more than able to shoulder the burden the Sixth Amendment demands.

## G. The Error Is Not Harmless

Confrontation clause errors are subject to constitutional harmless-error analysis. *Jasper*, 174 Wn.2d at 117 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). This test is significantly more stringent than that for violations of court rules and other nonconstitutional errors. *See State v. Robinson*, 153 Wn.2d 689, 697, 107 P.3d 90 (2005) (citing *State v. Templeton*, 148 Wn.2d 193, 220, 59 P.3d 632 (2002)). Under the constitutional error

standard, prejudice is presumed and the State must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State v. Stephens*, 93 Wn.2d 186, 190-91, 607 P.2d 304 (1980).

The Court of Appeals accepted the State's argument that any confrontation violation at Lui's trial was harmless, finding that if the State's experts funneled testimonial evidence to the jury, "[t]here is no reasonable probability this evidence contributed prejudicially to the verdict." *Lui*, 153 Wn. App. at 320 n.15. Because the State did not produce overwhelming untainted evidence of Lui's guilt, I disagree.

The "overwhelming untainted evidence" test considers the untainted evidence admitted at trial to determine "if it is so overwhelming that it necessarily leads to a finding of guilt." *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002) (citing *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985)). This test "ensures that a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict." *Id.*

Although the State offered sufficient evidence of Lui's guilt to permit a reasonable jury to convict him of murder, the untainted evidence was hardly overwhelming. This untainted evidence included Harruff's testimony that Boussiacos was intentionally strangled, and testimony impeaching Lui's credibility. Lui told investigators that the night Boussiacos disappeared he slept on the couch and heard nothing, and that when he awoke between 7:00 and 8:00 a.m., Boussiacos's car was gone. Ex. 43, at 34. However, phone records show that Lui

called his sister at roughly 1:00 a.m. and left a message; when confronted with these records, he gave an unlikely story that he had rolled over on his phone while sleeping. *Id.* at 31-32; 7 RP at 809-10, 827. The jury also heard that the couple's downstairs neighbors were awakened shortly after 3:00 a.m. by the sound of someone walking around upstairs. 5 RP at 566, 583-84. During questioning, Lui downplayed Boussiacos's discovery of his infidelity, insisting that they had "put that aside," despite his statements to friends and a 911 operator that the two had called off the wedding shortly before her disappearance. 14 RP at 1819-20; Ex. 43, at 25-28.

Lui's credibility was most damaged by his lie about Boussiacos's ring. Police did not find her engagement ring on her body or in a search of her purse, where friends testified she kept it. 14 RP at 1703. Lui denied having the ring and speculated that Boussiacos's mother had it or, alternatively, that Boussiacos had been wearing it when she left for California. 10 RP at 1431; Ex. 169, at 50-51, 80. At trial, the State established that Lui gave an identical ring to his current wife, who wore it until police took it into evidence. 12 RP at 1609-22, 1628-29; 14 RP at 1702-08. Even Lui's lawyer acknowledged that he had lied about the ring, calling it a "monumental mistake." 14 RP at 1866.

While a jury certainly could have found that this cumulative untainted evidence was probative of Lui's guilt, Washington courts have never found confrontation clause errors harmless beyond a reasonable doubt under such fragmentary and circumstantial evidence. *See State v. Flores*, 164 Wn.2d 1, 18-20,

186 P.3d 1038 (2008) (finding harmless error where the State presented untainted testimony, audio and video recordings, physical evidence, and defendant admissions); *State v. Davis*, 154 Wn.2d 291, 304-05, 111 P.3d 844 (2005) (State presented untainted testimony by victim and officers and photographs of victim injuries); *State v. Damon*, 144 Wn.2d 686, 693, 25 P.3d 418 (2001) (defendant did not contest that he had committed all the criminal acts charged); *State v. Powell*, 126 Wn.2d 244, 268, 893 P.2d 615 (1995) (untainted eyewitness testimony of repeated episodes of past abuse, including prior attempts at strangulation); *State v. Whelchel*, 115 Wn.2d 708, 728-29, 801 P.2d 948 (1990) (untainted eyewitness testimony and defendant confession); *Guloy*, 104 Wn.2d at 420-21 (undisputed evidence that defendant engaged in criminal conspiracy to murder both victims); *State v. Hopkins*, 134 Wn. App. 780, 792, 142 P.3d 1104 (2006) (untainted victim testimony, eyewitness testimony, and defendant confession); *State v. Saunders*, 120 Wn. App. 800, 812-13, 86 P.3d 1194 (2004) (untainted defendant admissions); *State v. Thomas*, 91 Wn. App. 195, 203, 955 P.2d 420 (1998) (untainted eyewitness testimony and physical evidence); *State v. Folkerts*, 43 Wn. App. 67, 73-75, 715 P.2d 157 (1986) (untainted eyewitness testimony, physical evidence, and defendant admissions); *State v. Roberts*, 31 Wn. App. 375, 380, 642 P.2d 762 (1982) (untainted eyewitness testimony). The untainted State's evidence against Lui was not in the same class.

Washington courts have consistently refused to find harmless error in cases like Lui's, where the untainted evidence was incomplete and suggested but did not

overwhelmingly establish the State's theory. *See State v. Grenning*, 169 Wn.2d 47, 59-60, 234 P.3d 169 (2010); *State v. Maupin*, 128 Wn.2d 918, 928-30, 913 P.2d 808 (1996); *State v. Easter*, 130 Wn.2d 228, 242-43, 922 P.2d 1285 (1996); *State v. St. Pierre*, 111 Wn.2d 105, 119-20, 759 P.2d 383 (1988); *Stephens*, 93 Wn.2d at 190-91; *State v. Romero*, 113 Wn. App. 779, 794-95, 54 P.3d 1255 (2002); *State v. McDaniel*, 83 Wn. App. 179, 187-88, 920 P.2d 1218 (1996); *State v. Vargas*, 25 Wn. App. 809, 815-16, 610 P.2d 1 (1980).

Moreover, the tainted testimony in this case was substantial and crucial to the State's theory. The State argues that the DNA results obtained by Orchid and Reliagene were inconclusive and that omitting Pineda's testimony would not have affected the outcome. It is true that the presence of Lui's DNA on the victim's shoelaces was not conclusive because the two shared a home. The Y-STR testing used in this case also could not exclude the possibility that Lui's son had touched her shoelaces. 12 RP at 1517-19. However, the DNA sample from the victim's shoelaces was the *only piece of evidence* linking Lui to the State's theory that he had dressed her after death and carried her body to the trunk of her car. *See* 14 RP at 1832-35. Jodi Sass, a forensic scientist in the DNA unit of the Washington State Patrol Crime Laboratory, testified that she had obtained a trace male genetic component from the oddly tied shoelaces found on Boussiacos's tennis shoes, but she was not able to generate a DNA profile from the sample. 9 RP at 1228-33. Without Pineda's testimony about the results of these tests, the State would have

presented photographs of oddly tied shoelaces but no evidence that Lui tied them after her death.

Because Lui and the victim had a consensual sexual relationship, the State contends that Pineda's testimony about trace amounts of Lui's semen in the vaginal swab was also not decisive and was not relevant to a material element of the crime. However, Pineda's testimony undercut Lui's claim that he and the victim had not had intercourse for two weeks before her disappearance. 14 RP at 1828-29; Ex. 43, at 21-23. The State highlighted this inconsistency to the jury, not just to undercut Lui's credibility, but as a possible motive for the killing. 14 RP at 1828-30.

The State argues that Harruff's tainted testimony about the time of Boussiacos's death, based on Raven's temperature readings, was equally supportive of Lui's defense that she was killed by a third person after leaving for the airport some time after the night of February 2. 10 RP at 1355-56. While the State was required to prove only that Boussiacos died sometime between February 2, when she disappeared, and February 8, when her body was found, Raven's temperature readings supported the State's theory that Lui murdered her the night she disappeared. *See* 14 RP at 1809.

Finally, the State contends that Harruff's testimony about the lack of nicotine in Boussiacos's blood was irrelevant since it did nothing more than undercut idle conjecture by Lui. 10 RP at 1430. Whether the victim was a smoker was not a material element of the crime charged, but the testimony hurt Lui's credibility and

went to the State's larger narrative that Lui had lied to investigators from the beginning.

The tainted evidence, particularly the DNA report, was crucial to the State's case. Pineda's testimony about the results of this testing linked Lui to the victim's shoelaces and undercut his story that the two had not had sexual relations in weeks. Harruff's testimony about the results of the WSTL toxicology screen made Lui's initial story look less like speculation and more like an intentional lie, and his testimony about the time of death lent support to the State's theory. The most the State can show is that it introduced sufficient untainted evidence to permit a reasonable jury to find Lui guilty. This showing does not satisfy the constitutional harmless error test and we should conclude that the errors were not harmless beyond a reasonable doubt.

## CONCLUSION

Consistent with United States Supreme Court precedent, I would recognize that the reports at issue in this case are testimonial and Lui was denied his Sixth Amendment right to confront the witnesses against him. The majority's newfound interpretation of the Sixth Amendment is based on the very rationale a majority of the United States Supreme Court has rejected in cases from *Crawford* to *Williams*.

Because the four reports at issue are testimonial, Lui was entitled to cross-examine the witnesses who prepared them and not settle with questioning well-credentialed conduits about their testimonial evidence.

The majority's fear that respecting the constitutional rights of Lui and similarly situated defendants will unduly burden the criminal justice system is exaggerated. Moreover, it provides no justification for charting an entirely new course in conflict with established precedent. I would reverse the Court of Appeals and remand this matter for a new trial. Accordingly, I respectfully dissent.

_____
Stephens, J.
Fairhurst. J.
Owens, J.
Chambers, J. PT Result only